FIDELITY BANKERS TRUST COMPANY, as Executor of the Estate of JAMES L. McKAY, Deceased v. CHAPMAN DRUG COMPANY.—366 S. W. (2d) 528.

Eastern Section. September 12, 1962.

Certiorari Denied by Supreme Court November 28, 1962.

L. B. Bolt, Jr., Knoxville, for appellant.

Egerton, McAfee, Armistead & Davis, Knoxville, for appellee.

COOPER, J. This suit was filed by the Fidelity Bankers Trust Company, as executor of the Estate of James L. McKay, deceased, to recover monies allegedly loaned the defendant Chapman Drug Company by McKay during his lifetime. In the original bill the complainant set out an analysis of the records of the defendant company, and contended that the records reflected that the defendant company owed the McKay estate the total sum of $45,593.48, plus interest and attorney's fee—$38,907.20 of the indebtedness being represented by a demand note dated June 30, 1958, and $6,686.28, being represented by a credit balance in McKay's personal account with the defendant company.

To this bill the defendant plead that (1) the note was void and of no legal effect as it was signed by McKay without authority and without the knowledge of the Board of Directors of the defendant company;

(2) that transactions occurring more than six years prior to July 1, 1959 (the date suit was filed) was barred by the Statute of Limitations;

(3) that McKay had unlawfully credited his account with 45% of the net proceeds of the commission paid by Chapman Drug to a partnership known as the G.M.B. Syndicate, of which McKay was not a legal member; that the partners in G.M.B. had authorized McKay to withdraw only 10% of such proceeds from and after January 1, 1956; that when the McKay account was corrected and the unauthorized G.M.B. credits deducted, McKay was indebted to the defendant Company in the

sum of $18,394.78, for which amount the defendant sought recovery.

The complainant filed a replication and an answer to the defendant's cross-bill averring that McKay had authority to sign the notes; that similar notes had been executed over a period of years; that the defendant company had accepted and retained the proceeds of the loans, and were, therefore, estopped to deny the lack of authority; and further, that the defendant company, by its conduct, had ratified the execution of the note.

The complainant also averred that the defendant company had no right or interest in the G.M.B. partnership, and could not call upon the Court to investigate and adjudicate the rights existing between McKay and the G.M.B. Syndicate; that the G.M.B. Syndicate was not and could not properly be a party to the lawsuit, as the propriety of withdrawals by McKay from the partnership was a separate, distinct and independent matter from the subject matter of the original litigation as set forth in the complaint.

After the taking of proof and argument of the case, the defendant Chapman Drug Company offered an amendment seeking to delete its averment that McKay had "unlawfully credited his account with * * * proceeds from a partnership designated G.M.B. * * * etc. * * * *", and to substitute the averment that McKay had "unlawfully credited his account with proceeds from an incentive commission or bonus arrangement instituted by Chapman Drug Company to encourage the promotion and sale of new lines of sundries designated as a bookkeeping entry on the records of Chapman Drug Company as G.M.B. * * * etc. * * * *"

The Chancellor refused to allow the amendment, holding that it was at variance with the defendant's sworn answer and with the testimony of defendant's witnesses; that it was not supported by the proof; and that it was barred by the doctrine of judicial estoppel.

Dr. Edgar L. Grubb and George W. Bailey, officers of the defendant company, then asked leave of the court to file an intervening petition, as individuals, to assert their rights as surviving members of the alleged partnership. This was refused on the ground, among others, that the rights of the individual partners to any partnership proceeds was a separate and independent issue, and should not be tried in the instant case.

The Chancellor, after making an exhaustive finding of fact, held:

(1) that McKay had authority to execute the demand note in the amount of $38,907.20 and dated June 30, 1958; that the defendant company was estopped to deny McKay's authority to execute the note; and that the defendant company had ratified the transaction;

(2) that the accounts involved were mutual running accounts which constituted one continuous transaction between McKay and the defendant company;

(3) that G.M.B. was a partnership in which the defendant company had no interest; and .

(4) that the defendant was indebted to complainant for monies loaned as follows:

(a) $38,907.20, on the note;

(b) $3,890.72, 10% attorney's fee provided in the note;

(c) $6,686.28, the mutual account item; and

(d) $6,778.34, interest at 6% on both the note and mutual account from July 1, 1959, the date suit was filed.

The Chancellor then entered a judgment in favor of complainant for $56,282.54.

The defendant appealed contending that there was no material evidence to sustain the finding of fact of the Court; that the Court erred in holding the promissory note valid; in holding that Grubb, McKay and Bailey had formed a partnership under the name of G.M.B. and that, if such partnership existed, in holding that the surviving partners could not assert their claim against the estate of McKay in this suit by intervening petition; and that the Court erred in refusing to permit the defendant to amend its answer to conform to the proof.

After a careful examination of the record, it is our judgment that the evidence does not preponderate against the Chancellor's finding of fact, but, to the contrary, supports it. T.C.A. sec. 27-303.

The record in this cause discloses that James L. McKay was Secretary-Treasurer of the defendant company from 1945, shortly after its purchase by Dr. E. L. Grubb, until his death on March 24, 1959. In 1945 or 1946, Dr. Grubb, McKay and George Bailey, the executive vice-president and general manager of the defendant company, formed the G.M.B. Syndicate for the purpose of increasing the volume of defendant's business. The defendant company paid the Syndicate a 5% commission on new sundry lines introduced into the business. These commission payments, during the period 1946-1958, to-

taled $140,924.04. Of these earnings, Dr. Grubb and McKay each received $63,809.84, or 45%, and Bailey received $13,304.38, or 10%. The books of the defendant company showed that these earnings were paid to Grubb, McKay and Bailey, as partners d/b/a G.M.B. Syndicate. Each year a partnership return of income was filed in behalf of the G.M.B. Syndicate, reporting the partners, their interest and the income each received from the Syndicate. The income, as reported, was included in the individual tax returns of the partners.

In testifying as to the creation of the G.M.B. Syndicate, and the type of organization created, Dr. E. L. Grubb, the principal stockholder and president of the defendant company, and one who shared in the proceeds from the Syndicate, testified as follows:

Record P. 63.

"Q. In this analysis prepared by Mr. Ben Davis, your auditor, reference is made to a partnership called G.M.B. Is that the correct name of that partnership or is it a syndicate.

"A. We called it G.M.B. Syndicate.

"Q. How did that name come into it?

"A. Combination of Grubb, Bailey, and McKay. Three in the organization.

"Q. When was that partnership formed?

"A. I don't recall. Several years ago.

"Q. Was it formed when you first took over Chapman Drug Company?

"A. Not at the very date * * * Believe it came on a little later.

"Q. Has it been in existence ten, eleven or twelve years?

"A. I imagine it has.

"Q. Who were the partners originally in that organization, the three you just mentioned, yourself, George Bailey and James L. McKay?

"A. Yes, sir."

Mr. Davis, the comptroller of the defendant company, testified as follows:

"Q. Any question in your mind from the records you examined but what Mr. McKay was one of the original partners?

"A. No, there is no question on that." Record P. 29.

The record further discloses that from time to time a substantial part of the commission earnings received by McKay from G.M.B. were loaned to the Chapman Drug Company, as were salary bonuses, proceeds from the sale of cemetery lots, distributing company bonuses, proceeds from the sale of a deep freeze, and proceeds from group insurance payments. These transactions were set out in detail on the defendant company's books. The amounts owing the officers for monies loaned were included each year in the company's comparative balance sheet, and were reported in the company's U.S. Corporation Income Tax return.

Further, each time a loan was made to the company by McKay, or one year's interest on an existing note was due and unpaid, a demand note was executed by the defendant company payable to McKay. Thirteen of these notes were signed by McKay, as Secretary-Treasurer

and three were signed by E. L. Grubb, as President. The first note signed by McKay was dated September 4, 1945, and covered a cash loan of $5,000.00. These notes were included each year in the company's comparative balance sheet, and were reported in the U. S. Corporation Income Tax Return. Further, they were shown in the outside audit secured by Dr. Grubb, as president of the defendant company in 1952.

The last of this series of notes was for $38,907.20 and was dated June 20, 1958. This note was signed by Chapman Drug Company by J. L. McKay, Secretary-Treasurer. It is unpaid.

The balance due on McKay's personal account, as shown by the defendant company's books, is $6,686.28. It is unpaid.

It is strongly urged in behalf of the defendant company that the demand note dated June 30, 1958 is invalid and unenforceable. The primary basis for the insistence is that McKay executed the note without authority, either express or implied, of the Board of Directors of Chapman Drug Company. However, in the course of its argument, the defendant appears to take the secondary position that the note was invalid because of the relationship of McKay to the defendant corporation.

It is well recognized that the fiduciary relationship of a corporate officer to the corporation does not preclude the officer from lending the corporation money and taking a note therefor, in the absence of fraud or circumstances indicating detriment to the corporation. Rawlings v. New Memphis Gaslight Co., 105 Tenn. 268, 60 S.W. 206; Wright et al. v. McLaury (7th Cir.), 81 F.(2d) 96; Vol. 3, Fletcher Cyclopedia Corporations (Perm. Ed.) Sec.

908, pp. 317 et seq.; 13 Am.Jur., Corporations, Sections 932 and 1042; 19 C.J.S. Corporations, sec. 779. However, such transactions will invite the closest investigation by the courts, and must be characterized by the utmost good faith.

■ We have carefully examined the record and defendant's brief and argument in the present case and have been unable to find any insistence that the money in question was not used by the defendant corporation, nor any assertion that the accounts, as reflected by the records of the defendant corporation, were incorrect. To the contrary, the record shows that all transactions between McKay and the defendant company were clearly and openly shown on all the records of the defendant company, and that the defendant company accepted, used and still retains the money loaned by McKay.

The record further shows that as Secretary-Treasurer, McKay was in full and complete charge of the company's finances. From time to time in the regular course of business, the defendant company would have need of additional capital, primarily to take advantage of cash discounts for merchandise. The defendant company did its banking with the Park National Bank, and adopted a resolution which gave McKay authority to borrow money from the Park National Bank, and execute notes as evidence of the debt. McKay was also given authority to do whatever was necessary to take care of overdrafts. Although the minutes of the defendant company revealed no resolution of its Board of Directors (Grubb, McKay and Bailey), expressly authorizing McKay to execute the note in question as evidence of the money owed him, the record revealed that the practice had been followed

for some 14 years, without objection by the other officers or stockholders.

"The rule generally followed is that the treasurer of a corporation has no authority, merely by virtue of his office, to issue negotiable or commercial paper on behalf of the corporation, although he may be empowered in such respect either expressly or by implication from other powers conferred upon him. * * *"

"While, however, it is generally agreed that the treasurer does not have inherent authority to execute commercial paper on behalf of a corporation, such authority attaches to him as a prima facie matter in certain instances * * *. [T]he treasurer of a corporation is presumed to have had authority to use the corporate name on notes for the benefit of another corporation or himself where the other directors who constituted the remaining stockholders knew that he had followed such practice for several years and did not object. 13 Am.Jur., Corporations, Sec. 913, p. 887.

We conclude, therefore, that the Chancellor was correct, under the above evidence, in finding that McKay had the authority to execute the note in question.

Further, we are of the opinion that even if there had been no express or implied authority to justify McKay signing the note in question, the action of the defendant company in retaining the benefits of the loans, after it acquired knowledge that McKay had executed the notes as evidence of the loans, amounted to a ratification of his acts. Bagley & Co. v. Union-Buffalo Mills, 9 Tenn.App.

63, 68-69; 62 A.L.R.(2d) 726; 2 Am.Jur., Agency, Sec. 214 et seq.

■ ■ It is next insisted by the defendant company that a recovery based on transactions between it and McKay that occurred before July 1, 1953 is barred by T.C.A. sec. 28-309, which provides, among other things, that actions on contracts not otherwise expressly provided for, shall be commenced within six years after the cause of action accrued.

The plaintiff insists that the transactions between the parties are controlled by T.C.A. sec. 28-312, which provides that when there are mutual accounts between persons who are not merchants, the time is computed from the true date of the last item (which was March 1, 1959), unless the account is liquidated and a balance struck.

"To render an account mutual, there must be an alternate course of dealing between the parties, giving rise to cross demands upon which they might respectively maintain actions, and there must be mutual agreement, express or implied that the items of the account upon the one side and the other are to be set against each other." 34 Am.Jur., Limitation of Actions, Sec. 97. See also 1 A.L.R. 1065, and 57 A.L.R. 203.

In the light of the above definition, we are of the opinion that the Chancellor correctly found that the account between the parties was a running, mutual account. However, the question is academic, for the application of either statute of limitations would not bar recovery of any portion of the McKay "personal account," nor reduce the amount due on the demand note.

The analysis of the McKay "personal account" contained in the record shows that the total indebtedness

occurred after December 31, 1954, for at that time, the McKay "personal account" was overdrawn $438.10. This would bring the entire indebtedness within the six year period prior to the filing of the present cause of action.

As to the note payable account, the record reveals that each new note executed contained the prior balance on the outstanding loans, and contained a new promise to pay. The note, which is the subject of this suit, was executed on June 30, 1958—well within the six year period of limitation.

■ In assignment V, the defendant insists that the Chancellor erred in refusing to permit the defendant to amend its sworn answer after the completion of the proof and trial of the cause. The tendered plea and the court's action are set out above.

■ ■ The allowing or disallowing of an amendment is a matter of discretion in the Chancellor, and, this court will not disturb the action of the Chancellor in the absence of a showing that there has been an abuse of such discretion. Baker v. Tennessee Gas Transmission Co., 194 Tenn. 368, 250 S.W.(2d) 566; McCarthy v. Catholic Knights and Ladies, 102 Tenn. 345, 350, 52 S.W. 142, 143.

■ While Courts are indulgent in allowing amendments to answers in matters of form, they are, for obvious reasons slow to allow material alterations in sworn answers signed by the parties. Baker v. Tennessee Gas Transmission, supra.

The effect of the amendment tendered in this case was to advance a new theory diametrically opposed and contradictory to the facts alleged in the sworn answer and contra to the testimony of defendant's witnesses.

"If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed. * * * It may accordingly be laid down as a broad proposition that one, without mistake induced by the opposite party, who has taken a particular position deliberately, in the course of litigation, must act consistently with it. One cannot play fast and loose." Southern Coal & Iron Co. v. Schwoon, 145 Tenn. 191, 229, 239 S.W. 398, 410.

We are of the opinion, therefore, that there was no abuse of discretion by the Chancellor in refusing to permit the defendant to amend his sworn answer after the completion of the proof and trial of the cause.

█ Finally, it is insisted that the Chancellor erred in not permitting Dr. Edgar L. Grubb, and George W. Bailey to intervene in this suit as surviving partners of G.M.B. Syndicate, if the Chancellor found that such a partnership existed, and assert their claim against McKay's estate. The motion was made by Grubb and Bailey after the completion of proof, and argument of counsel when, in the words of defendant's counsel "it became apparent that the Chancellor was going to hold that a partnership existed with reference to sundry commissions."

In denying the right to intervene, the Chancellor pointed out that the assertion of a possible claim against the estate of McKay for alleged excessive withdrawals by him from the G.M.B. partnership was not germane to the pleadings and proof in the present case, wherein suit was brought to recover money loaned by McKay to the defendant company, but would inject new matter. The Chancellor further called attention to the fact that

the McKay estate was solvent and was being administered in the County Court of Knox County, Tennessee, and that Grubb and Bailey had a remedy in that Court.

> "While our own practice is liberal, in allowing a stranger to intervene by petition, to set up his claim to property, or to a fund, in controversy in the Chancery Court * * *, nevertheless, to allow a third person to inject new matter into a litigation, not germane to the issues presented by the pleadings, would be to allow interminable confusion, incongruous issues, and general multifariousness, wholly at variance with every principle of true pleading, and tending inevitably to vexatious perplexity, alike to the litigants and to the Chancellor. For these reasons, no intervention should be allowed in any case where the new matters sought to be introduced, are irrelevant, multifarious, incongruous, or otherwise proper for an original bill." Vol. 2, Gibson's Suits in Chancery, 5th Ed., Sec. 842, p. 47.

We are of the opinion that under the circumstances above set out, the action of the Chancellor denying the right to intervene was not an abuse of his discretion. See City of Whitwell v. Fowler, 208 Tenn. 80, 86, 343 S.W.(2d) 897.

Having overruled all assignments of error, the judgment below is affirmed. Costs of the appeal are adjudged against the defendant and its surety.

McAmis, P. J., not participating.