INTERTHERM, INC., et al.,
Plaintiffs-Appellees,

v.

OLYMPIC HOMES SYSTEMS, INC.,
Johnny R. Bailey, Sr., Fred R. Langley
and James L. Clayton, Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section.

Feb. 24, 1978.

Certiorari Denied by Supreme Court
June 26, 1978.

**468**

⚖️186

P. Douglas Morrison, Morrison, Morrison & Morrow, Knoxville, for defendants-appellants.

Milton E. Henderson, Steltemeier & Westbrook, Nashville, for plaintiffs-appellees.

## OPINION

DROWOTA, Judge.

This is a suit by general creditors against an insolvent corporation and three of its shareholders. The issue is whether a security interest taken by two of the shareholders in personal property of the corporation is valid, and whether it entitles the two shareholders to priority over the general creditors as to the property covered by it.

This suit was filed on February 28, 1975, in the Chancery Court of Giles County, by plaintiff Intertherm, Inc., and others on behalf of themselves and of all other creditors of defendant Olympic Home Systems, Inc. (Olympic). In addition to Olympic, the complaint named as defendants Johnny R. Bailey, Sr., Fred R. Langley, and James L. Clayton, who were alleged to be "officers and/or principal stockholders" of Olympic. Plaintiffs alleged that Olympic was insolvent, and asked relief on behalf of its general creditors. Although plaintiff Intertherm and three other companies originally brought the suit, there is now a 365-page

technical record consisting primarily of the claims of dozens of creditors. The Chancellor found that these claims total "several hundred thousand dollars."

On October 24, 1975, the trial court entered his "order sustaining general creditors' action," and appointed a receiver to take charge of Olympic's property. Soon afterward, at the court's direction, the receiver conducted a sale of Olympic's inventory. The receiver reported that the sale of the inventory produced $11,172.00. After adding to this $6.30 "cash found on premises," the only income taken in by the receiver other than that derived from the sale, and deducting the expenses of the sale, the receiver was left with a net amount of $9,254.02.

It was shortly after the receiver's sale that defendants Langley and Clayton asserted the claim around which the instant controversy revolves. They filed with the court a petition in which they alleged that they held a valid security interest in the inventory that had been sold, and asked that the entire $9,254.02 held by the receiver be turned over to them. Plaintiffs answered the petition, denying the validity of the security interest and alleging that money transferred to the corporation by Langley and Clayton was payment for shares of stock rather than a loan. The Chancellor was thus called upon to determine the validity and priority of the security interest asserted by Langley and Clayton.

The evidence presented to the Chancellor is very meager, and establishes only the most basic facts. In the summer of 1973, defendant Langley was approached by Jim Roberts, who told Langley that he (Roberts), Roger Dale Baker, and defendant John R. Bailey wanted to form a company to manufacture mobile homes. Langley was interested, and became involved in some of the details of how such a corporation could be successfully structured. Langley also asked defendant Jim Clayton, a friend who had experience in the mobile home business, to join the discussions. All parties were apparently enthused about the project, and a plan was formulated. The plan called for Langley and Clayton to finance and construct, at a cost of about $150,000.00, the physical plant, which would be leased to the corporation. The corporation itself was to be headed by defendant Bailey as President and Chief Executive Officer. The financial structure called for an initial amount of $100,000.00, of which $25,000.00 was to be equity and $75,000.00 was to be debt in the form of loans or convertible debentures. Langley and Clayton were each to own 15% of the stock, while some persons known as the "Alabama Group" were to own the remaining 70%. Langley and Clayton would be "putting in" a total of $50,000.00 but would not participate in the day-to-day business of the company.

It appears that this plan was largely carried into effect, though it is not clear from the evidence whether the entire $75,-000.00 was loaned to the corporation as originally anticipated. On September 18, 1973, Langley and Clayton bought from the corporation, Olympic Home Systems, $7,500.00 worth of capital stock, so that each owned 15% of the stock of Olympic. On the same date, Langley and Clayton, participating equally, loaned Olympic $42,-500.00. This debt is evidenced by a promissory note dated September 18, 1973, in the amount of $42,500.00 with interest at 8½%, due and payable on or before January 1, 1974. The note recites that it is "secured by a security agreement of even date herewith covering certain property in the possession of the maker at its place of business in Ardmore, Tennessee." It is signed for Olympic by Johnny R. Bailey as President.

The security agreement, also dated September 18, 1973, gave Langley and Clayton a security interest in the following property of Olympic:

Accounts receivable, inventory, merchandise, work in process, building materials and all other materials and supplies used by Debtor in its manufacturing operations.

In addition to this property itself, the agreement secured "all additions and accessions thereto, substitutions thereof, and all

proceeds of its sale or other disposition." The agreement recites that it is "to secure the payment of a note dated September 18, 1973." It is signed for Olympic by Johnny R. Bailey, Sr., as President and attested by Roger Dale Baker. A financing statement and a copy of the security agreement were filed with the Secretary of State in Nashville, but not until September 18, 1974.

The record contains no evidence whatsoever of the day-to-day operations of Olympic, other than the numerous claims of creditors for unpaid accounts. It is obvious, however, that Olympic was not long in encountering financial difficulties. None of the defendants has contested the trial court's finding that Olympic is insolvent. On February 17, 1975, defendant Langley sold his stock in the corporation to defendant Bailey for $1.00. Defendant Clayton did the same, but the exact date of his sale is not clear.

These facts constitute almost all of the facts proven in this case. Some were established by copies of the promissory note, security agreement, and financing statement. Others appear in a copy of a letter written by Langley in August of 1973 to Ike Hobson, President of the Bank of Ardmore, which financed the real estate occupied by Olympic. Still others are found in the answers of defendants Langley and Clayton to fourteen interrogatories. The letter to Hobson is attached to these answers as an exhibit. Also attached are copies of Langley's checks to Olympic for $21,250.00 and $3,750.00, and Bailey's $1.00 check to Langley, as well as copies of handwritten notes taken by Langley and Clayton during preliminary negotiations.

In addition to facts already stated, the answers to interrogatories aver that Langley and Clayton loaned Olympic $42,500.00 for "operating capital." They also state that prior to the loan, the two men engaged in active negotiations with defendant Bailey, Dale Baker, and Jim Roberts, who were the promoters and operating officers. The answers state that the loan was not a capital contribution but a short term loan which Langley and Clayton expected to be repaid

from operating income within a year. Neither Langley nor Clayton said he knew why the financing statement was not filed until a year after the note and security agreement were executed, and both answered that it was not their intention that the loan be kept from public knowledge.

The only other evidence presented, and the only evidence that approaches live oral testimony, is a taped deposition taken by telephone. The deponent is J. Earl Rainwater, who was Langley's attorney and the man who drafted the security agreement. It was Rainwater who had custody of the loan documents and who failed to file a financing statement until September 18, 1974. He explained that he had been waiting to receive copies of the real estate documents, to be recorded by another attorney, and had delayed recording the U.C.C. documents until he received those copies. He said that neither he, Langley, nor Clayton delayed recording the security interest purposely. He gave two reasons for Langley's and Clayton's having bought $7,500.00 worth of stock and having loaned the corporation $42,500.00: this arrangement was to their tax advantage, and they did not want to buy $50,000.00 worth of stock in Olympic. Rainwater said that the loan was made because Olympic needed more money to get started than the amount obtained through stock subscriptions, but that he could not say whether the corporation was undercapitalized.

Rainwater's deposition, the loan documents, and the answers to interrogatories with attached exhibits are the only material evidence in the record on the issue of the validity of this security interest. No oral testimony was taken in the trial court. Aside from the claims of creditors, there is no evidence of how Olympic's business progressed after its inception. No corporate minutes, financial statements, or records of any kind for any period of the corporation's existence were introduced. Nowhere does it appear that either Langley or Clayton was an officer or director of Olympic. All the documents in the record that were executed by Olympic are signed by defendant

Bailey, the President, or Baker, the Secretary.

After considering the evidence, the Chancellor embodied his findings and conclusions in a very thorough memorandum, which contains quotes from and citations to relevant cases as well as a clear presentation of the facts. The Chancellor's holding was that Langley and Clayton are not secured creditors entitled to priority over the general creditors. This holding is based in the main on his findings that the loan was not an arm's-length transaction, and that it constituted a contribution to capital rather than a loan. The Chancellor said that "[t]o allow the shareholders to disguise their contribution of capital as a loan to the detriment of other creditors would be a fraud on all other creditors." Defendants Langley and Clayton have appealed the Chancellor's ruling.

■ Defendants devote the first part of their brief to the argument that they have met the requirements of Tennessee's version of the Uniform Commercial Code, T.C.A. § 47–1–101 et seq., for a security interest in Olympic's inventory and priority over its general creditors. While this point was apparently in contention in the trial court, plaintiffs have not disputed it in this Court. We think there is no doubt that the security agreement between Olympic and Langley and Clayton properly covers inventory of Olympic and its proceeds, and so covers the funds claimed by defendants here. Further, it is clear that T.C.A. § 47–9–201 gives the holder of even an unperfected security interest priority over general creditors of the debtor as to the property secured. See J. White & R. Summers, Uniform Commercial Code § 25–2 (1972). The real question in the instant case is whether on the instant facts there are legal or equitable reasons for disregarding the priority otherwise apparently accorded Langley and Clayton by the U.C.C.

■ It is true, in Tennessee as elsewhere, that there is no general prohibition against a good faith transaction between a shareholder and his corporation. See *Russell v. Tennessee & Kentucky Tobacco Co.*, 16

Tenn.App. 561, 65 S.W.2d 256 (1933); 18 C.J.S. *Corporations* § 489 (1939). Accordingly, a shareholder may lawfully loan money to his corporation and receive security therefor. 13 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5739 (1970); 18 Am.Jur.2d *Corporations* § 490 (1965); Annot., 31 A.L.R.2d 663, 671 (1953).

■ It is also generally held that officers and directors may, in good faith, lawfully loan money to the corporation they serve and take security therefor. See, e. g., 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 952 (1975). This rule is clearly followed in Tennessee. *Rawlings v. New Memphis Gaslight Co.*, 105 Tenn. 268, 60 S.W. 206 (1900); *Fidelity Bankers Trust Co. v. Chapman Drug Co.*, 51 Tenn.App. 246, 366 S.W.2d 528 (1962); *McConnell v. Sprouse*, 13 Tenn.App. 291 (1931). The rule further provides, however, that "such transactions will invite the closest investigation by the courts, and must be characterized by the utmost good faith." *Fidelity Bankers Trust Co., supra*, at 255, 366 S.W.2d at 532. The burden of proving such good faith is on the officer or director. See *Smith v. Mississippi Livestock Producers Ass'n*, 188 So.2d 758 (Miss.1966); 19 Am.Jur.2d *Corporations* § 1298 (1965).

As can be seen from cases like *Fidelity Bankers Trust Co., supra*, and *Smith, supra*, close investigation is accorded a corporation's transactions with an officer or director, and the burden of proof is placed upon the officer or director, because of his fiduciary capacity. As a fiduciary, the officer or director has a strong influence on how the corporation conducts its affairs, and a correspondingly strong duty not to conduct those affairs to the unfair detriment of others, such as minority shareholders or creditors, who also have legitimate interests in the corporation but lack the power of the fiduciary.

■ It is also generally held, in accordance with the leading case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), that courts will closely scrutinize the transactions of a majority, dominant, or

controlling shareholder with his corporation, and will place the burden of proof upon the shareholder when the good faith and fairness of such a transaction is challenged. See 18 Am.Jur.2d *Corporations* § 504 (1965). Sometimes this rule is stated to apply to corporate transactions with "shareholders," unmodified by "majority," "dominant," or "controlling." See, *e. g.*, Annot., 31 A.L.R.2d 663, 676 (1953). It is obvious, however, that the reason for applying the rule to a shareholder is the same as the reason for applying it to an officer or director, that is, that he occupies a fiduciary position with regard to the corporation and those interested in it. Unless it is shown that a shareholder owns a majority of the stock or that he otherwise controls or dominates a corporation, however, a shareholder cannot be said to be a fiduciary and the reason for closely scrutinizing his transactions with the corporation disappears. Further, in reviewing the cases in which the courts have closely scrutinized transactions between a corporation and a shareholder and have put the burden of justifying them on the latter, we find that they almost invariably involve a majority, dominant, or controlling shareholder. See, *e. g., Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Small v. Williams*, 313 F.2d 39 (4th Cir. 1963); *Albert Richards Co. v. The Mayfair*, 287 Mass. 280, 191 N.E. 430 (1934); *Belcher v. Webb*, 176 Wash. 448, 29 P.2d 702 (1934). Accordingly, it is clear that courts should apply the rule of close scrutiny and place the burden on the shareholder to justify a transaction with his corporation only when the shareholder owns a majority of stock, or is shown to dominate or control the corporation to a significant degree in some other way.

In the instant case, defendants contend that their secured loan to Olympic should be upheld under the general rule that shareholders may lawfully contract with their corporation. Plaintiffs, on the other hand, argue that this Court should scrutinize this transaction closely and put the burden of justifying it on defendants who, plaintiffs further argue, have failed to carry that burden. We hold that the in-

stant transaction should not be subjected to close scrutiny, and that the burden of proof should not be on defendant shareholders, because plaintiffs have offered no evidence from which we could conclude that defendants owned a majority of Olympic's stock or otherwise dominated it in such a way as to justify imposing fiduciary responsibilities on them.

There is no evidence in this record that either defendant Langley or defendant Clayton was ever an officer or director of Olympic. The evidence is that each owned 15% of the capital stock of Olympic. It is clear that both were involved in setting up the corporation, but there is nothing to show that they participated in the business afterward. There is evidence that they did not intend to participate in the corporation's everyday affairs. No corporate records of any sort appear in the record. Consequently, it is impossible to know whether defendants had voting stock, whether they acted together to exert their 30% influence, or whether each used his 15% ownership in a different way. Nor is there any indication of who was in the "Alabama Group" that was to own the remaining 70% of the shares, or of how ownership of those shares was divided. In short, there is no evidence of any degree of power or control by defendants over the corporation at any time. As far as we can tell from this record, defendants were simply two 15% shareholders who, although they participated in setting up the corporation, were not even its promoters. It is our conclusion that plaintiffs are required to present at least some evidence that defendant shareholders were also officers or directors, or that they in some significant way dominated the corporation, in order to invoke close scrutiny of the transaction and place the burden of justifying it on defendants. Plaintiffs have failed to do so here.

Plaintiffs, then, by failing to show that defendants Langley and Clayton had any fiduciary capacity with Olympic, have failed to shift from themselves the burden of proving fraud or absence of good faith in the loan transaction. That they have also

failed to carry that burden of proof is discussed below.

Plaintiffs, however, also argue that Olympic was undercapitalized. A finding of undercapitalization is often used by courts, especially in federal tax cases and insolvency proceedings, as a reason for treating stockholder-corporation transactions that in form are loans or purchases of debt securities as contributions of equity capital. See 1 F. O'Neal, Close Corporations § 2.10 (2d ed. 1971). Plaintiffs argue that Olympic was undercapitalized, and that consequently the $42,500.00 transferred to Olympic by defendants was not in fact a loan but a contribution of equity capital. This situation, plaintiffs seem to say, would have the following effects: (1) that the transaction was not a loan voids defendants' security interest and means that they are not creditors of Olympic at all; (2) that the $42,500.00 was equity capital means that defendants Langley and Clayton were majority shareholders, and that their transactions with Olympic are subject to the close scrutiny and burden of proof discussed earlier.

■ A corporation is undercapitalized when the amount of capital invested in its equity securities is insufficient for the requirements of the particular business. Courts and commentators have stated many different tests for determining whether a corporation is sufficiently undercapitalized to consider treating all or part of its "debt" to shareholders as equity. Some, for example, propose that the test should be whether an outsider would have made a loan to the corporation under the circumstances. See 1 F. O'Neal, Close Corporations § 2.10 (2d ed. 1971). Others say a corporation is undercapitalized when only a nominal amount is invested in equity. See *id.* It has also been suggested that a debt/equity ratio of about 4:1 can be considered "safe." See *id.* Whatever test is used, it is clear that the exact definition of undercapitalization varies according to the type of business or industry involved, and even according to the features of the particular business being examined. Again, unless the shareholder whose loan is challenged is in some way a fiduciary, the burden of proving undercapitalization should be upon the challenger. See *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256 (N.D.N.Y.1968).

■ In the instant case, the scant evidence is insufficient to support a finding of undercapitalization. In *Brunner, supra,* the court expressed regret at the absence of expert testimony but affirmed the referee's finding of undercapitalization on the basis of extensive data on the corporation's expenses and operations from its minutes and financial statements. In the instant case we lack not only expert testimony but also, as we have pointed out, any information from Olympic's records about any aspect of its business. There is no testimony as to what amount of capitalization is generally needed in the mobile home manufacturing industry, nor as to what was needed or expected to be needed in Olympic's case. Rainwater testified that Olympic needed more than the $25,000.00 obtained from stock subscriptions to get started, but stated that he could not say whether Olympic was undercapitalized. Indeed, the only evidence urged with any zeal by plaintiffs to show undercapitalization is that Olympic's equity was $25,000.00 while its debt was from $42,500.00 to $75,000.00, a ratio of no more than 3:1. This, without more, is insufficient to support a finding that Olympic was undercapitalized.

■ On the meager evidence in this record, then, we have no choice but to conclude that defendants were minority shareholders without control, and that Olympic was adequately capitalized. Have plaintiffs nevertheless proven that a fraud was perpetrated on them, Olympic's general creditors, or that the loan was not an arm's-length transaction? We think not. The only concrete evidence is that defendants participated in organizing Olympic, a corporation with a debt/equity ratio of about 3:1. They each purchased 15% ($3,750.00 worth) of its $25,000.00 worth of equity securities, and lent it $42,500.00 of its debt for which they took security. The security interest was not recorded for a year. Defendants and

their attorney, by answers to interrogatories and taped deposition, respectively, categorically denied any intent to defraud creditors by any of their actions. No oral testimony was taken in the trial court, so that the factor of the witnesses' credibility, an area in which this Court gives great deference to the trial court, is wholly lacking. Defendants have not been shown to have been officers or directors of Olympic, or to have participated in its management in any way. That the loan was to defendants' tax advantage is not enough, of itself, to prove that it was not an arm's-length transaction. The loan in question was made when the corporation was begun, before it became insolvent, and before it had any general creditors. There is no evidence that defendants misrepresented the corporation's financial structure to creditors, or that they acted in bad faith in any way.

We conclude that the evidence in this case is insufficient to sustain a finding of fraud or lack of good faith against defendant shareholders, Langley and Clayton. To find fraud on the instant facts would amount almost to finding it fraudulent *per se* to organize a corporation with a debt/equity ratio of 3:1 in which minority shareholders are also substantial secured creditors. Such an inflexible rule could inhibit the development of a great many perfectly sound new businesses, for "[n]o private investor could be expected to invest in the debt securities of a corporation he does not control if he must run the risk of having his debt security classified as a stock in the event of the corporation's failure." *Brunner, supra,* at 266.

Our decision does not imply a disavowal of the equitable principles of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and its progeny, which judge very strictly the transactions of a fiduciary with his corporation and place the burden of justifying those transactions on the former. Nor do we quarrel with the understanding of those cases displayed by the Chancellor, who carefully analyzed and applied them. We have simply concluded that there is no evidence in the instant case that defendants Langley and Clayton had any fiduciary po-

sition in or control over Olympic, and that consequently no reason has been shown for invoking the strict rules of cases like *Pepper.* Similarly, we do not imply that a fraud on creditors could not be found in the organization of a corporate structure similar or identical to Olympic's. We simply hold that this record does not contain enough evidence to demonstrate that such a fraud occurred in the instant case.

We hold that defendants Langley and Clayton have a valid security interest in the property of Olympic recited in the security agreement of September 18, 1973, and that no reason appears for subordinating that interest to the claims of Olympic's general creditors. The decree of the Chancellor is reversed and the case is remanded for a final determination of the priority of claims to Olympic's remaining assets in accordance with State law and with this opinion.

Reversed and remanded.

SHRIVER, P. J., and TODD, J., concur.