504

In re Norman I. GAYNES and Elaine N. Gaynes, husband and wife, Debtors.

Norman I. GAYNES and Elaine N. Gaynes, husband and wife, Plaintiffs,

v.

Warren FREEMAN, et al., Defendants.

James F. CRAMER, et ux., et al., Counterclaimants.

v.

Norman I. GAYNES and Elaine N. Gaynes, husband and wife, Counterdefendants.

Bankruptcy No. B–81–174 PHX VM. Adv. No. 81–204.

United States Bankruptcy Court, D. Arizona.

June 15, 1982.

Douglas C. Fitzpatrick, Secona, Ariz., for Gaynes.

Jack D. Klausner, Daryl Manhart, Phoenix, Ariz., for Sroka.

Larry McCormley, Phoenix, Ariz., for Freeman and PCA.

Philip T. Goldstein, Phoenix, Ariz., for Cramer.

## MEMORANDUM OPINION AND DECISION

VINCENT D. MAGGIORE, District Judge.

This matter is before the Court on the Motion for Summary Judgment of Plaintiffs, Norman I. Gaynes and Elaine N. Gaynes, his wife (herein "the Gaynes") and the Cross-Motion for Summary Judgment of Defendants, Winfield Scott, et ux., James F. Cramer, et ux., John Braddock, et ux., and Donald Tyler, et ux. (hereinafter severally and collectively "the Investors"). In oral argument and in the motion papers submitted, the Gaynes and the Investors agreed the case, as between them, was ripe for summary disposition. They further granted that a resolution of their dispute rests in the main on the interpretation and meaning of two basic provisions contained in a written preincorporation agreement dated March 30, 1978.

The motion papers, depositions of the parties, depositions of witnesses, and the record in general, reveal the following situation, which, although somewhat complex, must be understood if the respective legal positions of the movants and cross-movants are to be dealt with fairly.

Norman I. Gaynes (herein "Norman") is a chemist by profession. He is a specialist in the technical development of paint coatings and processes. The Gaynes moved to Arizona from New Jersey in the summer of 1977. Prior to the move, Norman had been employed in a research and technical capacity for several eastern paint manufacturers.

Shortly after his move to Arizona, Norman looked for a manufacturing business he could purchase. Norman did not have sufficient capital to either fund the purchase or finance the operation of a manufacturing business.

In late 1977, Norman saw a newspaper advertisement soliciting prospective buyers to purchase the assets of an established paint manufacturing business called Lupton Bros. Paint Manufacturing (herein "Lupton Bros."). The advertisement reflected an asking price of $250,000.00, payable on terms. Lupton Bros. appealed to Norman.

Norman engaged Defendant, PCA Management Corporation (herein "PCA"), a management consulting firm, to help raise the needed capital to fund the purchase. Defendants, Warren Freeman (herein "Freeman") and Leo Sroka (herein "Sroka"), are the principal officers, directors and stockholders of PCA.* Norman, aided by PCA, made a written offer dated January 17, 1978 to purchase Lupton Bros. for $250,000.00. Norman's offer was accepted.

Thereafter, Norman and PCA scurried about to find a lender who would give Norman the money necessary to complete the purchase. Every institutional lender they approached refused to loan any money to Norman.

Sroka was an insurance agent. He had sold insurance for many years and was involved in several business ventures. Sroka had sold insurance to each of the Investors. Sroka convinced the Investors to advance $174,000.00 and become associated with Norman in the paint business. The Investors' $174,000.00 was insufficient to satisfy the $250,000.00 purchase price and allow for start-up capital.

Norman successfully renegotiated the sales price for Lupton Bros. The sales price was reduced to $176,365.00. A cash payment of $115,513.30 was required to be paid to Lupton Bros. at closing. The unpaid balance of the purchase price ($60,851.70) was to be satisfied on a deferred payment basis. The Lupton Bros. sale closed in late March 1978.

The Investors, the Gaynes and PCA entered into a pre-incorporation agreement

---

* The action brought by the Gaynes against PCA, Freeman and Sroka still pends in this Court. The Motions considered herein do not concern or affect the outcome of the Gaynes' claims against PCA, Freeman and Sroka.

dated March 30, 1978. Their purpose was to define their business relationship. The agreement provided, *inter alia*, for the organization of a corporation under the name Lupton Paint Manufacturing Corporation of Arizona (herein "Desert Knight").** The Investors agreed to subscribe for 1,950 common voting shares of Desert Knight at $10.00 per share. The Gaynes subscribed for 2,250 shares.[1] PCA was to receive 800 shares in lieu of the payment of a commission. The agreement further provided that Norman, the Investors and Freeman would serve as Desert Knight's Board of Directors, and that Norman would serve as Desert Knight's President, Freeman as Secretary-Treasurer, and each of the Investors as a Vice President. Norman was to manage the day-to-day affairs of Desert Knight at an annual salary of $24,000.00.

It was additionally agreed that Desert Knight would be capitalized by a total borrowing of $153,000.00 from the Investors. The borrowing was to be evidenced by Desert Knight's promissory note to each of the Investors in the amount of his individual loan.[2] Each note was to mature on or before March 31, 1981. Interest on the principal was to accrue at the rate of 18% per annum. Desert Knight's borrowing from the Investors was to be secured by Deeds of Trust encumbering four parcels of real estate owned by the Gaynes.

For the purposes of this case, the critical provisions of the agreement are paragraphs 7 and 10. Paragraph 7 reads in pertinent part:

"7. *Loans by Certain Shareholders:*

(a) Within thirty days after the incorporation of the Corporation, the following named Shareholders hereby agree to loan to the Corporation the following amounts, such amounts to be repaid as indicated and at the indicated annual interest rate as hereinafter described:

| Party | Amount | Annual Interest Rate | Term of Loan |
|---|---|---|---|
| J. Braddock | $25,500.00 | 18% | 3 yrs. |
| J. Cramer | $51,000.00 | 18% | 3 yrs. |
| W. Soctt | $51,000.00 | 18% | 3 yrs. |
| D. Tyler | $25,500.00 | 18% | 3 yrs. |

(b) The loans to be made to the Corporation as herein provided shall be evidenced by promissory notes of the Corporation payable to Braddock, Cramer, Scott and Tyler (the 'Noteholders') and shall be repayable by the Corporation in monthly payments commencing May 1978."

Paragraph 10 reads:

"10. *Security for Notes*: Gaynes, in order to ensure that the Corporation shall satisfy its obligations to the Noteholders, hereby agrees to prepare and deliver to the Board of Directors of the Corporation a promissory note in the amount of $150,000 (the 'Secured Note') payable to the Corporation, without interest, due March 31, 1981 and secured by a Deed of Trust covering the following parcels of real estate situated in Pima County, Arizona, and owned in fee simple absolute by Gaynes:

*Parcel 1* (160 Acres): Lot 5–6–7–8, Section 30, Township 10 South, Range 12 East of the Gila and Salt River Base and Meridian, Pima County, Arizona.

*Parcel 2* (160 Acres): Southeast Quarter (¼) of Section 30, Township 10 South, Range 12 East of the Gila and Salt River Base and Meridian, Pima County, Arizona.

*Parcel 3* (67 Acres): All that part of the West one-half (½) of the Southwest Quarter9¼) (sic) of Section 11, Township 16 South, Range 16 East of the Gila and Salt River Base and Meridian, Pima County, Arizona, lying southerly of Colossal Cave Road, as established in

---

** The name of the corporation was later changed to Desert Knight Coatings and will, therefore, hereinafter be referred to as "Desert Knight."

1. One of the derivative claims brought by the Investors charges that Gaynes breached the agreement by never paying for the shares issued to them. In deposition, Norman testified that Sroka had advised the Gaynes that they had no obligation to honor the subscription agreement.

2. Although the agreement expressly provided for a $153,000.00 loan, it is undisputed that the actual advance was in the sum of $150,000.00.

the records of the Pima County, Arizona Recorder's Office.

*Parcel 4* Residence located at Scarborough, Maine.

In the event that the promissory notes, including interest thereon, referred to in Section 7 hereof are not paid in accordance with Section 7, and remain unpaid as of March 31, 1981, then the proceeds of the Secured Note shall be used to immediately satisfy the unpaid obligations of the Corporation to the Noteholders."

In accordance with paragraph 10, the Gaynes delivered their "Secured Note" dated March 31, 1978 for $150,000.00 to Desert Knight, payable on or before March 31, 1981. The Gaynes also executed, acknowledged and delivered for recording, Deeds of Trust encumbering Parcel 1 (160 acres), Parcel 2 (160 acres), and Parcel 3 (67 acres). The Gaynes did not furnish any Deed of Trust encumbering Parcel 4, the Scarborough, Maine residence.[3]

The Gaynes and their daughter, Debbie Gaynes, commenced managing and operating Desert Knight's wholesale and retail paint business. The business proved unprofitable from the start. The Investors attribute Desert Knight's failure to Norman's poor management. Norman asserts that Desert Knight was undercapitalized from the start. Norman also claims that PCA, Freeman and Sroka did not adequately appraise the value of the assets purchased from Lupton Bros. Accordingly, accounts receivable thought to be collectible were either non-existent or bad. A discussion of the reasons for the failure of Desert Knight's business is presently immaterial.

In July 1980, the Gaynes filed suit in the Superior Court of Pima County, Arizona, against the Investors, PCA, Freeman and Sroka. The Gaynes' Complaint asserted multiple claims for relief, including a claim to quiet title in the Gaynes, to Parcels 1, 2 and 3. On September 29, 1980, the Pima County Superior Court granted the Investors, PCA, Freeman and Sroka's Motion for Change of Venue. The case was transferred to the Maricopa County Superior Court.

On January 27, 1981, the Gaynes filed a debtor's petition in this Court pursuant to 11 U.S.C. Chapter 13. On May 4, 1981, this Court entered an order enjoining the Investors and Desert Knight from proceeding against Parcels 1, 2 and 3. On May 28, 1981, the case was removed from the Superior Court to this Court pursuant to 28 U.S.C. § 1478.

The Gaynes have amended their Complaint on four occasions. The Gaynes Fourth Amended Complaint alleges five separate claims for relief. The only claim alleged by the Gaynes against the Investors is set forth in the Gaynes' First Claim for Relief. Claims for Relief Two through Four are against only PCA, Freeman and Sroka.

The Gaynes' claim against the Investors is brought under the Declaratory Judgment Act. It seeks an adjudication of the rights of the Investors to the property encumbered by the Deeds of Trust against Parcels 1, 2 and 3.[4] It essentially alleges that the Deeds of Trust, pursuant to the terms of the pre-incorporation agreement, are assets of Desert Knight, and were not given to secure any of the Investors' loans. It argues that the Investors are general creditors of Desert Knight and are not entitled to any preferential right against the encumbered parcels over Desert Knight's other creditors.

In their answer, the Investors alleged, *inter alia*, that paragraphs 7 and 10, read *pari materia*, plainly indicate that the Gaynes' interest in the four parcels was intended to secure the Investors' loans to

---

**3.** The Gaynes sold the Scarborough, Maine residence. Norman testified in deposition that the Maine property had never been intended to constitute security for Desert Knight's borrowing from the Investors. The Investors, PCA, Freeman and Sroka dispute the Gaynes' claim in this respect. This factual dispute does not affect the Motions presently considered.

**4.** The Gaynes dropped their claims against the Investors alleged in the Superior Court litigation for conspiracy to defraud, sale of fraudulent securities, common law fraud and quiet title.

Desert Knight. The Investors counter-claimed against the Gaynes. The Investors' Counterclaim is couched in seven separate and distinct counts. The first four are in the nature of shareholders derivative claims. The Investors, as shareholders, sued on behalf of Desert Knight. The four counts essentially charged the Gaynes with mismanagement of Desert Knight's business, breach of the subscription agreement in failing to pay Desert Knight for the 2,250 shares the Gaynes received, and misappropriation of Desert Knight's assets. Counts Five, Six and Seven are brought in the names of the Investors. They generally allege that the Investors were fraudulently induced to advance $150,000.00 to purchase stock of Desert Knight by the Gaynes' representation that the loan would be secured by Parcels 1, 2, 3 and 4. The remedies sought are a declaration of an equitable lien against the real estate and the finding of a constructive trust for the benefit of the Investors. The Investors also cross-claimed against PCA, Freeman and Sroka.[5]

The Gaynes filed their Summary Judgment Motion on February 24, 1982. The Investors answered and cross-moved for summary relief on April 2, 1982. The quintessence of the Gaynes' Motion is that pursuant to the terms of the pre-incorporation agreement, Desert Knight holds the Deeds of Trust and any proceeds realized from the real estate for the benefit of Desert Knight's general creditors, including the Investors. The Gaynes' Motion additionally argues that the Investors are precluded from proceeding against the real estate to the exclusion of other general creditors of Desert Knight by force of A.R.S. § 10–048(A)(3).

The Investors' Cross-Motion reasons that paragraph 10 of the pre-incorporation agreement clearly furnishes them with a security interest in the property in the event of Desert Knight's default on its loan to them. The real estate, the Investors say, was to be held by Desert Knight as security

for the exclusive benefit of the Investors in order to satisfy the debt owed them by Desert Knight. It is incontestable that Desert Knight defaulted on its loan commitment to the Investors.

During oral argument, the Gaynes' counsel and the Investors' counsel were in agreement that the language in paragraphs 7 and 10 was unambiguous. Parol evidence was unnecessary they said, to explain what the Gaynes, the Investors and PCA intended by their agreement. No extrinsic evidence was offered or brought to the attention of the Court. Both counsel expressed their willingness to rely on the Court's interpretation of the meaning intended by paragraphs 7 and 10.

It is meaningful to note that during oral argument, the Gaynes' counsel maintained that neither the Gaynes, nor the debtors' estate had any claim or interest in the real estate.

As can be seen, the Court has been presented with a complete and undisputed factual situation. The preceding outline of the undisputed facts, pleadings, and the parties' respective contentions, both depicts the background of the controversies sought to be adjudicated and reveals the questions presented by the competing Motions. The Motions are to be decided upon Count One of Gaynes' Fourth Amended Complaint, the Investors' Answer, and more importantly, upon an interpretation of the meaning of paragraphs 7 and 10 read *pari materia* of the pre-incorporation agreement.

■ The question to be herein decided can be simply stated. It is whether paragraph 10 of the pre-incorporation agreement gives the Investors a security interest in the real estate.

The Summary Judgment procedure provided by Rule 56, Fed.R.Civ.P. was used as a procedural device in bankruptcy courts before the recent enactment of the new rules governing bankruptcy procedure. *Beall v. Pinckney*, 132 F.2d 924 (5th Cir.

---

**5.** The Investors cross-claimed for damages against PCA, Freeman and Sroka. *The Court has been advised by counsel for the Investors*

and by counsel for PCA, Freeman and Sroka, *that the dispute between their respective clients has been settled and compromised.*

1943); *Cohen v. Eleven West 42nd Street, Inc.*, 115 F.2d 531 (2nd Cir. 1940); *In Re Yellow Transit Freight Lines, Inc.*, 207 F.2d 602 (7th Cir. 1953).

Further, Rule 756, Rules of Bankruptcy Procedure, expressly provides:

"Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings."

The admonition uttered in *Doehler Metal Furniture Co. Inc., v. United States*, 149 F.2d 130, 136 (2nd Cir. 1945) that the "court should go slow about making haste by a summary judgment" has been weighed. Nonetheless, when assertions are relied upon solely because of the terms of a written agreement and the parties agree that the language is unambiguous, and do not propose to offer any evidence tending to interpret the terms, it becomes the duty of the court to examine the agreement to determine whether it says, in legal effect, what the parties assert it says. Here, the agreement upon which the Gaynes rely is before the Court by common consent. It speaks for itself, but not as asserted by Gaynes.

Paragraph 7 confirms the Investors' loan and the terms of repayment by Desert Knight to the "Noteholders". Paragraph 10 is free from obscurity. Its meaning is plain. Its intention was to provide a mechanism to secure the Investors' loan to a new enterprise attendant with risk. To induce the Investors to loan the monies and join the enterprise, the Gaynes agreed to pledge their properties "in order to ensure that the Corporation shall satisfy its obligations to the Noteholders." It is pellucid from the wording used that Desert Knight was to hold the Deeds of Trust for the Investors' benefit, in the event Desert Knight defaulted under its promissory notes to the Investors. Thus, paragraph 10 expressly provides that:

"In the event that the promissory notes, including interest thereon, referred to in Section 7 hereof are not paid in accordance with Section 7, and remain unpaid as of March 31, 1981, then the proceeds of the Secured Note shall be used to immediately satisfy the unpaid obligations of the Corporation to the Noteholders."

The effect of the preceding language was to make the Investors secured creditors of Desert Knight.[6] The real estate was to constitute a special fund to be held for the benefit of the Investors in the event Desert Knight could not satisfy its debt obligation to the Investors.

The Gaynes contend that the Investors are general creditors of Desert Knight who have no priority claim against the real estate over other creditors because of their relationship to the corporation. This is unsupported in law.

■ There is no general prohibition against a shareholder contracting with his corporation. 18 C.J.S. *Corporations*, § 489 (1936). Accordingly, a shareholder may lawfully loan money to his corporation and receive security therefor.

■ Even officers and directors may, in a good faith transaction, loan money to the corporation they serve and take security therefor. See, *e.g.*, 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 952 (1975); *Monroe v. Scofield*, 135 F.2d 725 (10th Cir. 1943); *Standard Lumber Co. v. Interstate Trust Co.*, 82 F.2d 346 (5th Cir. 1936); *R. J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277 (10th Cir. 1977); *Intertherm, Inc. v. Olympic Home Systems, Inc.*, 569 S.W.2d 467 (Tenn.App.1978).

■ No reason exists in law for subordinating a secured loan made to a corporation by a shareholder, officer or director to the claims of its general creditors in the absence of bad faith, fraud or overreaching.

**6.** Even if parol evidence were to be considered in this case, it is to be noted that Freeman, Sroka, Braddock, Scott, and Cramer uniformly testified in depositions and Rule 56(e) affidavits, that the parties, during the negotiations leading to the pre-incorporation agreement agreed to secure the Investors' loans to the corporation by the Gaynes' four parcels. In a deposition taken of Norman in December 1980, Norman admitted that it was his intent to encumber his interest in the real properties to Desert Knight in order to secure its borrowing from the Investors.

In *Intertherm, Inc. v. Olympic Home Systems, supra*, general creditors brought suit against an insolvent corporation, Olympic Home Systems ("Olympic"), and three of its shareholders, Bailey, Langley and Clayton. The plaintiffs sought to avoid a security interest in personal property given by Olympic to secure a loan made to Olympic by shareholders Langley and Clayton. The plaintiffs urged that Langley and Clayton were not entitled to priority in the secured property over the general creditors.

In the summer of 1973, the promoters of Olympic had approached Langley and Clayton and solicited them to invest in Olympic's business of manufacturing and selling mobile homes. A pre-incorporation plan had been formulated. It provided, among other things, that Langley and Clayton each subscribe for 15% of Olympic's stock and loan Olympic $42,500.00. Olympic's borrowing from Langley and Clayton was to have been evidenced by a promissory note with interest payable on the principal at 8% per annum. Olympic's note was to have been secured by an agreement granting a security interest in Olympic's:

> "Accounts receivable, inventory, merchandise, work in process, building materials and all other materials and supplies used by Debtor in its manufacturing operations." (569 S.W.2d 469)

Olympic had become insolvent approximately two years after its organization. A receiver had been appointed at the request of the plaintiffs to take charge of Olympic's assets. The receiver had conducted a sale of Olympic's inventory. The sale had realized cash proceeds of $11,172.00. After deducting the expenses of sale, the receiver had been left with a net amount of $9,254.02.

Langley and Clayton petitioned for an order requiring the receiver to remit the net sale proceeds to them by reason of their security lien against the inventory sold. The trial court found that Langley and Clayton were not entitled to priority over the general creditors because their loan to Olympic had in fact been a contribution to capital. The trial court further determined that the Langley-Clayton loan to Olympic had not constituted an arms-length transaction.

The Tennessee Appellate Court reversed. It recognized the general rule that shareholders, officers and directors may lawfully loan money to their corporation and receive security therefor, provided the loan is made in good faith.

The court found that the rule of close scrutiny did not apply to Langley and Clayton because neither owned:

> "a majority of stock, [n]or is shown to dominate or control the corporation to a significant degree in some other way." (569 S.W.2d 472)

Moreover, there was no evidence that Langley and Clayton participated in the corporation's everyday affairs. The court concluded that Langley and Clayton had a valid security interest in the property described in the security agreement "and that no reason appears for subordinating that interest to the claims of Olympic's general creditors." (569 S.W.2d 474). The Court determined that the evidence:

> "in this case is insufficient to sustain a finding of fraud or lack of good faith against defendant shareholders, Langley and Clayton." (569 S.W.2d 474)

A lack of good faith or fraud was non-existent because:

> "The loan in question was made when the corporation was begun, before it became insolvent, and before it had any general creditors. There is no evidence that defendants misrepresented the corporation's financial structure to creditors, or that they acted in bad faith in any way." (569 S.W.2d 474)

■ The Court sees no reason why in all fairness and good conscience, the Investors should be deprived of their security for a loan fairly made to Desert Knight. The loaned funds were necessary to capitalize the corporation at inception. The assets of Lupton Bros. could not have been purchased without the Investors' investment and loan to Desert Knight. The Investors enhanced the value of the corporation and its assets.

At the time the Investors made the secured loan, Desert Knight was solvent and had no trade creditors. There is no evidence in this record and the Gaynes have presented none indicating that the Investors were guilty of overreaching, bad faith or fraud in the secured loan transaction.

Further, it is beyond dispute that the Gaynes family managed and controlled the daily business affairs of Desert Knight. There is no evidence showing that the Investors interfered or participated in the day-to-day business of Desert Knight. Thus, there is no evidence that the Investors dominated or controlled Desert Knight in any manner.

Under these circumstances, it would be difficult, if not impossible, to find that the Investors acted in bad faith and fraudulently secured the real estate to themselves to the detriment of Desert Knight's creditors. Under the facts and the law, the Court is constrained to conclude that the Investors are secured creditors of Desert Knight and have priority over any claims of its general creditors.[7]

The Gaynes argue that A.R.S. § 10–048(A)(3) is pertinent and precludes the Investors from proceeding against the security. The statute provides:

"A. In addition to any other liabilities imposed by law upon directors of a corporation:

\* \* \* \* \* \*

3. The directors of a corporation who vote or assent to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known debts, obligations, and liabilities of the corporation shall be jointly and severally liable to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations and liabilities of the corporation are not thereafter paid and discharged."

The statute prevents directors from using their position of gaining an unfair advantage by distributing assets to themselves and the shareholders of a corporation that has outstanding creditors.

The statute is inapposite under the facts presented herein. There is nothing in the statute that prevents a stockholder to whom a company is heavily indebted from undertaking fair proceedings to collect a secured debt.

There is nothing in the record that shows that the Investors distributed Desert Knight's assets to themselves. The Investors have simply sought to realize on the security held for their benefit by Desert Knight pursuant to the terms of paragraph 10.

The effect of this decision is that the Investors' Motion for Summary Judgment is granted. The Gaynes' Motion for Summary Judgment is denied. The restraining order entered May 4, 1981 enjoining the Investors and Desert Knight from proceeding against the real estate is hereby dissolved because the Gaynes concede that neither the Gaynes nor their debtors' estate has any interest or rights therein. The statutory stay of proceedings pursuant to 11 U.S.C. § 362 is also lifted as against the Investors and Desert Knight.

By force of this Opinion, the remaining issues between the Gaynes and the Investors to be tried arise under the Investors' counterclaims. Counsel for the Investors has advised the Court that the Investors have agreed to voluntarily dismiss their counterclaims against the Gaynes in view of the granting of the Investors' Motion. Counsel for the Investors shall prepare a written judgment consistent with this Opinion.

---

7. Desert Knight has been joined as a party in these proceedings by reason of the Investors' shareholders' derivative claims against the Gaynes. Desert Knight is, in essence, represented by the Investors herein. The Court questions the Gaynes' standing and the Court's power to make any order protecting the general creditors of Desert Knight. Neither Desert Knight nor its general creditors have invoked this Court's jurisdiction and requested protection under the bankruptcy laws. This Court is reluctant to extend its jurisdiction over absent parties who have not invoked the power of this Court.