**In re B & L LABORATORIES, INC., Debtor.**

**John C. McLEMORE, Trustee and Hickory Specialties, Inc., Plaintiffs,**

v.

**Jay OLSON, Glenn Fisher, Pioneer Leasing, a partnership composed of Jay Olson and Glenn Fisher and Olson-Fisher Industrial Equipment Partnership, a partnership composed of Jay Olson and Glenn Fisher and Olson-Fisher Industrial Equipment Partnership, a partnership composed of Jay Olson and Glenn Fisher, Defendants.**

Bankruptcy No. 284–02413.
Adv. No. 284–0451.

United States Bankruptcy Court,
M.D. Tennessee.

June 23, 1986.

Edwin M. Walker, McMackin, Garfinkle & McLemore, Nashville, Tenn., for trustee.

Jay S. Bowen, L. Wearen Hughes, Bass, Berry & Sims, Nashville, Tenn., for Hickory Specialties, Inc.

William T. Conner, Crossville, Tenn., for Jay Olson.

Robert J. Warner, Jr., Marc T. McNamee, Dearborn & Ewing, Nashville, Tenn., for Glenn Fisher, Pioneer Leasing and Olson-Fisher Indus. Equipment Partnership.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The "veil" of this debtor corporation is appropriately "pierced" to subject the debtor's shareholders to personal liability for the claims against this estate. The debtor was a sham corporation, organized and operated to carry out an illegal scheme. The partnership defendants were controlled by the debtor's shareholders and performed as integral parts of a fraud on creditors. The defendants are liable as partners and as the recipients of an unlawful distribution of B & L's assets. Defendants Olson and Fisher are individually liable for breach of their fiduciary duties as officers, directors and majority shareholders of B & L. The defendants' claims against B & L are subrogated to all other claimholders.

▪▪▪ The following constitute findings of fact and conclusions of law.[1] Bankr.R.

---

1. Preliminary to trial, defendants asked for my recusal on the theory that my participation in a pretrial/settlement conference disqualified me to preside at trial. Defendants also raised the affirmative defense of the statute of limitations.

Recusal of bankruptcy judges is governed by 28 U.S.C. § 455 (1982 ed.). *See* Bankr. R. 5004(a). Generally, a judge's participation in pretrial proceedings and conferences does not form the basis for disqualification. *Adams Extract Co. v. Green Bay Packaging, Inc. (In re Corrugated Container Antitrust Litigation)*, 752 F.2d 137, 145 (5th Cir.1985) *cert. denied,* —— U.S. ——, 105 S.Ct. 3536, 87 L.Ed.2d 660 (1985); *United States v. Anderson*, 433 F.2d 856, 860 (8th Cir.1970); *Botts v. United States*, 413 F.2d 41, 44 (9th Cir.1969). To disqualify a judge on the grounds of bias, the prejudice must be manifest and it has been said that the bias must come from an extrajudicial source. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966). Nothing transpired at the pretrial conference in this case to suggest any basis for recusal.

Defendants argue that this action by the trustee is barred by either TENN. CODE ANN. §§ 28-3-105(2) or 28-3-109(3) (Michie 1980) which respectively provide a limitation of three years on actions for conversion and six years for contract actions not otherwise provided for.

The gravamen of this action is to pierce the corporate veil to redress misconduct by di-

7052. This is a core proceeding. 28 U.S.C. §§ 157(b)(2)(B), (O) (1982 ed., Supp.II 1984).

## FACTS

Hickory Specialties, Inc. ("Hickory Specialties") manufactures and sells an extract of smoke which is used in the flavoring, curing and coloring of meats ("liquid smoke").

Hickory Specialties employed Charles Ledford ("Ledford") as manager of its Crossville, Tennessee plant. Ledford took photographs and measurements, made detailed sketches of the equipment and learned the liquid smoke manufacturing process which Hickory Specialties guarded as a trade secret. Ledford was discharged from Hickory Specialties on June 1, 1978.

·Ledford immediately teamed with David Bilbrey ("Bilbrey") to form the debtor corporation, B & L Laboratories, Inc. ("B & L"), to take advantage of Ledford's knowledge of the trade secrets of Hickory Specialties. On June 21, 1978, B & L was chartered with the stated purpose to "engage in the business of producing for wholesale and retail sale liquid smoke products and accessories, general machinery and other products related to the production of liquid smoke." Bylaws were adopted on July 10, 1978. The bylaws in the minute book are incomplete, undated and unsigned. The first minutes were signed by Edwin Lansford ("Lansford"). Lansford is an accountant and attorney who maintained the books and records of B & L and related entities.[2]

Bilbrey opened a bank account for B & L in July, 1978. Bilbrey deposited $200,000 into the account, but treated these funds as his own. He withdrew $185,000 to purchase a certificate of deposit which was never available to B & L. No stock was issued to Bilbrey.

In June and July of 1978, Ledford planned B & L's business operations. He negotiated for a plant site. He sought customers for B & L's future liquid smoke production. His salary and expenses were paid from B & L's bank account.

On August 1, 1978, Hickory Specialties and Griffith Laboratories, Inc. ("Griffith"),[3] filed suit against B & L and Ledford in the Chancery Court for Cumberland County, Tennessee seeking an injunction and damages for usurpation of trade secrets. On October 13, 1978, the Chancellor denied injunctive relief. Hickory Specialties and Griffith appealed. On July 6, 1979, the Tennessee Court of Appeals reversed the Chancellor and entered a comprehensive injunction prohibiting B & L and Ledford from using trade secrets of Hickory Specialties and Griffith.

After commencement of the trade secrets litigation and with knowledge that B & L's right to manufacture and market liquid smoke was under attack,[4] defendants Olson and Fisher negotiated with Ledford

---

rectors, officers and shareholders. The defendants' actions continued through several years literally until the bankruptcy filing. This adversary proceeding was commenced on November 29, 1984, well within two years of the filing. *See* 11 U.S.C. § 108 (1982 ed., Supp.II 1984). Without regard to which state statute of limitation one chooses, the defendants' continuing misdeeds well into 1983–84 defeat any statute of limitation claims.

**2.** Lansford never performed a formal audit of the books and records of B & L and related entities. The financial statements which he prepared were either compilations or reviews. He explained that the various entities comprising the smoke operation were so "intermingled and tied together" that it made it "tough to do anything other than a compilation."

**3.** Griffith developed and patented the process for manufacturing liquid smoke which it licensed to Hickory Specialties. The extent of the license granted to Hickory Specialties is subject to some dispute and is not before this court.

**4.** Olson testified that he was generally aware of the trade secrets litigation, but he eschews knowledge of any specific rulings made in the case. Similarly, Fisher claims no familiarity with the progress of the litigation subsequent to the first ruling of the chancellor. I find this testimony incredible. Olson and Fisher are sophisticated businessmen. They invested large sums of money in the smoke operation. They had competent legal advisors in the trade secrets litigation. I belive that Olson and Fisher were acutely aware of the trade secrets litigation throughout their involvement with B & L.

and Bilbrey for involvement in and, ultimately, control of the B & L enterprise. On February 26, 1979, Olson and Ledford signed the B & L bank signature card as treasurer and president, respectively.[5] Olson and Fisher borrowed $22,000[6] for the "Purchase of Share of B & L Laboratories." This $22,000 was paid to Bilbrey.

On February 28, 1979, Ledford, Olson and Fisher were elected directors of B & L. Ledford was elected president; Fisher, vice-president; and Olson, secretary/treasurer. Three hundred shares of stock were authorized. Olson and Fisher subscribed for 100 shares each.[7] In April of 1979, 100 shares of B & L stock were issued to Ledford for his efforts, knowledge and experience in designing the plant, selecting equipment, and supervising construction and installation.

On March 14, 1979, B & L purchased real estate for a plant in Cumberland County, Tennessee. The purchase price was paid from B & L's bank account and the land was deeded to B & L. The land was listed among B & L's assets in Lansford's working papers, but not formally accounted for on the records of B & L. Also on March 14, 1979, B & L contracted with Jacobs Construction Company ("Jacobs") to construct a "manufacturing building" on the Cumberland County property for $359,000.

At a meeting of shareholders and directors on April 20, 1979, Olson, Fisher and Ledford agreed to strip B & L of its assets and to vest ownership of B & L's assets in Olson and Fisher personally.[8] The defendants now insist that they stripped B & L of assets for tax purposes.[9] The minutes of April 20, 1979 state that B & L's assets were transferred to Olson and Fisher because they advanced money to the corporation. An unexecuted agreement between B & L, Olson and Fisher prepared by Lansford during 1979 states that the assets were removed from B & L to protect Olson and Fisher: "Olson and Fisher each have considerable personal wealth which may be placed at risk ... and ... the parties' personal estates should be protected from loss in so far [sic] as practical."

On April 25, 1979, B & L deeded its Cumberland County real property to Olson and Fisher. No lease agreement between B & L and Olson and Fisher was executed. No rental payment was agreed upon. B & L continued to pay the real property taxes. B & L continued to use the assets it transferred to Olson and Fisher.[10]

**5.** The original B & L account had been closed and was actually "reopened" on February 26, 1978. There is no indication who closed the account or what happened to any balance of funds.

**6.** Upon renewal of this $22,000 note in 1980, B & L was added as a borrower.

**7.** The minutes do not reflect whether the subscriptions were in writing, whether they were approved by the board, or what consideration was to be paid. Olson and Fisher were each issued 100 shares on February 28, 1979; however, no amounts were paid by Olson and Fisher at that time.

At some later time, Lansford made an adjusting entry retroactive to April 30, 1979 reducing the "loans from officers" account $10,000 and increasing the "advances to officers" account $5,000, while crediting B & L's common stock account $15,000. The explanation was "to record stock issued." As discussed *infra*, even this "retroactive" entry left B & L with no capital and a negative net worth.

**8.** In connection with B & L's April 30, 1980 financial statement, Lansford prepared a "re-

view program" which states that "all fixed assets of the company are to be owned initially by the stockholders in their own names, even though various items of equipment were ordered in the company name and paid for with company funds (advanced for that purpose by the stockholders), and assembled and installed by company employees."

**9.** I am unconvinced by the defendants' attempts to portray the transfer of B & L's assets as tax manuevering. Evidence of *contemporaneous* consideration of the tax implications of these transactions is lacking. Discussion of taxes with Lansford and with Fisher's accountant were casual and hypothetical. Lansford could not connect any tax consideration to the timing of the transfer of B & L's assets. The paperwork which would be necessary and consistent with the defendants' claimed tax considerations was never accomplished by the parties.

**10.** B & L paid for insurance on the building and its contents as well as liability insurance for the smoke operation. The insurance was maintained in the name of "Tennessee Hickory Products, division of B & L Laboratories, Inc." On

Also on April 25, 1979, Olson and Fisher executed a deed of trust on the Cumberland County property to secure a construction loan for the plant. B & L paid a $10,000 loan commitment fee to the bank. During 1980 and 1981, interest on this construction loan was paid through B & L accounts.

In late April, 1979, Olson and Fisher opened a bank account in the name of "Olson & Fisher," P.O. Box 768, Crossville, Tennessee. This was the operating account of Olson-Fisher Industrial Equipment Partnership ("OFIP"). OFIP consisted of Olson and Fisher. No written partnership agreement was executed. OFIP claimed to own some or all of the equipment used in the smoke operation. The defendants contended that OFIP leased this equipment to B & L. No lease agreements were executed. OFIP had no office separate from B & L. No lease payments were made or agreed upon. OFIP's 1979 financial records show no rent accrual from B & L. Lansford stated in a letter to Fisher dated March 20, 1980, "rather than fabricate a fictitious rental income [on the partnership tax returns], we chose to show the applicable expenses with no income." B & L paid the personal property taxes which were billed to Tennessee Hickory Products ("THP")[11] as "owner" of the equipment used by B & L.

In May 1979, the address on B & L's bank account was changed to P.O. Box 768,

Crossville. During 1979, B & L opened three other bank accounts in the name "Tennessee Hickory Products, a division of B & L Laboratories, Inc". The addresses on all accounts were P.O. Box 768, Crossville, Tennessee.[12]

In August, 1979, in violation of the state court injunction, a "LIQUID SMOKE AGREEMENT" was consummated with the Baltimore Spice Company. Ledford signed as president and stockholder and Olson and Fisher signed as stockholders of "Tennessee Hickory Specialties" ("THS").[13] In return for an option to purchase 25% of "the Manufacturer," Baltimore Spice agreed to purchase its liquid smoke requirements from THS.

B & L continued construction of its Cumberland County liquid smoke plant after entry of the state court injunction. Jacobs submitted construction invoices to B & L. To this point, B & L had no income. Olson and Fisher simply wrote checks when the corporation needed money. Construction was completed in August or September of 1979 and B & L began producing liquid smoke in violation of the injunction.

On October 14, 1979, Olson, Fisher and Ledford voted to require B & L to forego the proceeds of life insurance policies it maintained on its officers in favor of their spouses. It was also voted that all company assets would be owned equally by Ledford, Fisher and Olson.[14]

---

October 14, 1981, Jay Olson signed a sworn proof of loss on this insurance policy. The proof of loss stated that the damaged property was owned by Tennessee Hickory Products. Lansford testified that the damaged property was owned by Olson-Fisher Industrial Equipment Partnership.

11. Tennessee Hickory Products was a trade name used by B & L for the liquid smoke operation. It appeared on the stationery. It is similar to the name Hickory Specialties, Inc. Allegations that it was chosen to confuse the latter's customers were raised by Hickory Specialties in the state court litigation.

12. Within 60 days of the state court injunction in the trade secrets litigation, B & L stopped using its original bank account and began using the "THP" accounts. Lansford testified that B &

L's bank accounts were used like escrow accounts by the defendants.

13. "Tennessee Hickory Specialties", like "Tennessee Hickory Products" was a "doing business as" B & L. "Tennessee Hickory Specialties" is even more similar to plaintiff, "Hickory Specialties, Inc."

14. By October of 1979, it is not clear what assets B & L had to divide among its shareholders. B & L's real property had been transferred to Olson and Fisher in April, 1979. Though the defendants produced no bill of sale or other document evidencing the transfer of B & L's *personal property* to anyone, OFIP claimed ownership of all of B & L's equipment.

In December, 1979, Olson and Fisher conveyed to Ledford a one-third interest in the Cumberland County real estate. The deed stated that tax bills were to be sent to B & L. Fisher testified that Ledford never acquired any interest in the equipment or in OFIP, the equipment partnership. Fisher also claimed that Ledford had no authority to sign OFIP checks though many checks drawn on the OFIP account were signed by Ledford.

On October 9, 1979, B & L applied for permission to appeal to the Tennessee Supreme Court from the July 6, 1979 injunction of the court of appeals. On November 8, 1979, the Tennessee Supreme Court issued a restraining order protecting Hickory Specialties' trade secrets during the appeal. Notwithstanding the restraining order, B & L continued to produce liquid smoke. On December 27, 1979 the Tennessee Supreme Court denied B & L's appeal.

The unsigned minutes of a joint meeting of directors and stockholders of B & L on January 10, 1980 state: B & L had insufficient cash to pay current expenses; Olson and Fisher would provide additional financing if Ledford would prepare new operating information; sales were below projections and operations might be suspended to dispose of inventories; and reasonable lease payments for the land, building and equipment should be commenced when payment amounts could be determined. The minutes discuss the Baltimore Spice agreement.

On February 11, 1980, the Chancery Court permanently enjoined B & L, Ledford, etc., from using or disclosing trade secrets of Hickory Specialties. The court ordered that confidential information be returned to Hickory Specialties. On February 28, 1980, Hickory Specialties petitioned the Chancery Court for civil contempt, alleging B & L had violated the injunctions.

On April 15, 1980, the Chancellor found that B & L had violated the February 11 injunction and again ordered B & L and Ledford to cease production of liquid smoke and to dispose of manufacturing equipment and inventory. The Chancellor referred the cause to a clerk and master to determine damages. The defendants noticed an appeal from the April 15, 1980 order. This appeal was dismissed by the Tennessee Court of Appeals on November 7, 1980.

Olson, Fisher, Ledford, Lansford and B & L's counsel, William Conner,[15] were present for a shareholders' meeting on April 18, 1980. Unsigned, handwritten minutes state that 8,000 gallons of liquid smoke were sold to a company in North Carolina that morning and that a shipment of 4,700 gallons to Baltimore spice was planned for the following week. These sales were in violation of the various state court injunctions. Fisher indicated displeasure with Ledford. Olson was elected president over Ledford's objection. Olson continued as secretary. Fisher made a motion to cease operations. There was discussion of Fisher's "personal responsibility." Olson assumed day-to-day management of the smoke operation.[16]

On September 5, 1980, in the trade secrets litigation, the clerk and master filed a report finding no damages. This recommendation was ultimately discarded and on July 1, 1983 the chancery court granted judgment to Hickory Specialties for $2,134,-000 "as damages for the contempt of the order of this court." [17]

In November, 1981, Griffith settled its dispute with B & L. The settlement included Griffith's purchase of the real property and equipment used by B & L. Griffith was supplied with a list of assets of B & L. In the sale documents it is stated that "B &

---

15. William Conner, Esq. of Crossville, Tennessee acted as the original incorporator of B & L in June of 1978.

16. Notwithstanding Olson's assumption of management responsibilities, B & L continued to pay Ledford's salary until sometime in 1982.

17. On July 20, 1983, B & L filed a notice of appeal from the Chancellor's award of damages.

L and Pioneer [18] own/or are lessors of certain land, buildings, equipment and other assets used by B & L in the manufacture, storage and shipment of liquid smoke." B & L is identified as one of the sellers of the equipment. OFIP is not mentioned in these agreements.

Between November 6, 1981 and November 15, 1983, Griffith paid $1,510,515 to purchase the land, equipment and vehicles used by B & L. Most of this money was deposited directly to the Olson and Fisher partnership account or to the personal bank accounts of Olson or Fisher, or was paid to retire debts of Olson or Fisher. For example, $414,279 went to First National Bank to pay off the $400,000 obligation of Olson, Fisher, Ledford and their wives. Eighty-six thousand dollars was deposited to the Olson & Fisher account. One hundred fifty-three thousand six hundred dollars was paid to Jay Olson and $28,662 was paid to Glenn Fisher. Seven hundred thirty-six thousand seven hundred ten dollars was deposited to a trust account. From this trust account, approximately $375,000 was paid to the Olson & Fisher account, $150,000 to Olson and $162,000 to Fisher. Checks were then written from the Olson & Fisher account to Olson for $142,329, to Fisher for $11,451 and to Cumberland Truck Leasing, Inc. ("CTL") [19] for $209,219.

Fisher withdrew $100,000 from CTL. Forty thousand dollars of the sale proceeds were allocated to trade secrets and good will of B & L. This amount was never paid to B & L.

At a special meeting of directors and stockholders of B & L on June 13, 1983, Ledford's stock was declared "null and void because of various acts by Ledford...." [20] The unsigned minutes state that B & L's assets had been sold; that B & L had no further business purpose; that B & L's liabilities far exceeded its assets and B & L had ceased operations. A resolution passed that the corporation be dissolved.

A statement of intent to dissolve the corporation was filed on July 11, 1983. On July 26, 1983, in a letter from Conner to Lansford, Conner discussed the judgment against B & L and expressed concern for "protecting Glenn and Jay from any attempts to pierce the corporate veil and get to them with respect to the judgment." No further action was taken to dissolve the corporation.

The internal financial statements prepared by Lansford and the expert testimony at trial [21] demonstrate that B & L operated with an ever-increasing deficit in re-

---

On January 24, 1984, the Tennessee Court of Appeals dismissed B & L's appeal.

18. "Pioneer" or "Pioneer Leasing Company" was a partnership which supposedly owned and leased the land and building used by B & L in the smoke operation. Olson, Fisher and Ledford claim to be the partners of Pioneer. The only evidence of the existence of this partnership is tax returns. Although Pioneer was an accrual taxpayer, the returns show no consistent treatment for the alleged accrual of rent from B & L. No partnership agreement exists. No deed, bill of sale or other evidence of assets of the partnership was introduced. No lease was proven between Pioneer and any other entity. Pioneer had no offices or visible operations. Notwithstanding the claims that OFIP owned the equipment used in the smoke operation, Lansford prepared a 1979 financial statement listing all of the plant equipment as assets of Pioneer.

19. Cumberland Truck Leasing was a corporation based in Crossville, Tennessee, wholly owned by Fisher. CTL may have advanced money to B & L. These transfers are not represented by promissory notes. CTL's money was probably used for construction and to purchase equipment. B & L used vehicles obtained through CTL. CTL issued some invoices to THP. There are invoices describing equipment rented by B & L and others indicating equipment sold to B & L. No rental payments were made by B & L to CTL.

20. In April, 1983, Lansford made an adjusting entry on his worksheets cancelling Ledford's stock. There is no indication of this cancellation in the certificate book.

21. Daniel M. Van Sant ("Van Sant"), a certified public accountant, testified for the plaintiffs. Van Sant reviewed the books, records, tax returns and other financial statements of B & L and analyzed the financial relationships of the parties involved in the smoke operation. Van Sant was a convincing witness.

tained earnings. B & L began the eight month period ending December 31, 1979 with a deficit in retained earnings of $3,705 and ended with a deficit of $54,013. Lansford was concerned in 1979 that the company was undercapitalized and he expressed this concern to Olson and Fisher. For the fiscal year ending April 30, 1980, B & L had a deficit in retained earnings of $83,930 and a deficit in stockholders' equity of $68,-930. The financial statement for that period also indicates a loss in net income of $80,225. For the fiscal year ending April 30, 1981 the deficit in retained earnings rose to $175,114 and the deficit in stockholders' equity was recorded as $160,114. Fiscal 1981 pre-tax losses were $91,184.[22]

B & L's tax returns for 1982, 1983 and 1984 document continuous losses and negative retained earnings. The 1984 return shows no receipts, total assets of $2,179 and a deficiency in retained earnings of over $1.6 million.

The smoke operation depended upon funding from Olson and Fisher. The two partnerships, OFIP and Pioneer, were used to funnel money into and assets out of B & L. Equipment invoiced to B & L or THP was paid for from the OFIP account. That account was used to pay B & L's payroll taxes, utility bills, and raw materials expenses. Charges for construction of the B & L plant were billed to B & L, but paid from the Olson & Fisher account. On occasion, money was transferred from the Olson & Fisher account to B & L to enable B & L to make payments. The checks to B & L were eventually stated as "loans" on B & L's books. The great bulk of these "loans" are not represented by promissory notes and no repayment schedules were established. Olson and Fisher intended to fund the operation of the corporation through these advances. Olson and Fisher expected repayment from the manufacture of liquid smoke.

On September 18, 1984, B & L filed a voluntary Chapter 7 petition. Excluding claims of related entities and one $10,000 disputed claim, Hickory Specialties is the only listed creditor. OFIP has a scheduled claim of $181,018.92. Olson described this as the difference between the cost of equipment and what Griffith paid for it. Lansford thought it was the balance owed on the equipment, including equipment "rental" and cash advances from Olson and Fisher to B & L. An examination of Lansford's working papers indicates that this amount was previously deleted or forgiven. Olson and Fisher are scheduled with each owed one-half of $139,976.59. Olson could not explain this claim. Lansford thought it was for "rental" or other amounts due Pioneer. The accounting records of B & L indicate this amount was transferred to B & L's capital account in 1983. Schedule A-3 lists a $36,000 claim for "Jay Olsen [sic] salaries." Olson instructed Lansford to include this amount for "time and trouble." Lansford did not know how Olson arrived at this figure and knew of no salary approved for Olson by the corporation.

## DISCUSSION

### I.

██ Suits by trustees to impose liability on a corporate debtor's officers, directors or shareholders are controlled by applicable state law. *See Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Bast v. Orange Meat Packing (In re G & L Packing Co.)*, 41 B.R. 903 (N.D. N.Y.1984).[23] Tennessee respects the gener-

---

22. In connection with B & L's financial statement for the fiscal year ending April 30, 1981, Lansford states in a letter that "management has elected to omit some of the disclosures required by generally accepted accounting principles. If the admitted disclosures are included in the financial statements, they might influence the user's conclusions about the company's financial conditions, results of operation and the change in financial condition." He also states that his firm is "not independent as to" B & L.

23. *Burks* and *Bast* both stand for the propositions that corporations are unique creatures of state law and that "there is no body of federal law of corporations for courts to draw on. *Bast*, 41 Bankr. at 910. In *Bast*, the court found, however, that significant federal policies were implicated by application of the state law of corporate identity and that accordingly the federal common law should be applied to pierce the corporate veil. No obvious federal policies

al rule that corporate form provides insulation for officers, directors and stockholders absent special circumstances. *See Electric Power Board of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985); *Continental Bankers Life Insurance Co. of the South v. Bank of Alamo*, 578 S.W.2d 625 (Tenn. 1979); *Nashville C. & St.L.Ry. v. Faris*, 166 Tenn. 238, 60 S.W.2d 425 (Tenn.1933); *Fidelity Trust Co. v. Service Laundry Co.*, 160 Tenn. 57, 22 S.W.2d 6 (Tenn.1929); *Dillard and Coffin Co. v. Richmond Cotton Oil Co.*, 140 Tenn. 290, 204 S.W. 758 (Tenn.1918); *T. Towles & Co. v. Miles*, 131 Tenn. 79, 173 S.W. 439 (1915); *Neese v. Fireman's Fund Insurance Co.*, 53 Tenn. App. 710, 386 S.W.2d 918 (Tenn.Ct.App.) *cert. denied*, (Tenn. Oct. 5, 1964); *Post Sign Co. v. Jemc's, Inc.*, 48 Tenn.App. 13, 342 S.W.2d 385 (Tenn.Ct.App.1960) *cert. denied*, (Tenn. Jan. 16, 1961). The Tennessee courts have recognized several theories for piercing the corporate veil including: "alter ego, instrumentality, identity, agency and estoppel...." *Continental Bankers*, 578 S.W.2d at 631. The burden of proof rests on the party seeking to pierce the veil. In *Continental Bankers*, the Tennessee Supreme Court stated the elements of proof of the instrumentality theory:

> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate

entity, as to that transaction had no separate mind, will or existence of its own;[24] (2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights; (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 632.[25]

In *Federal Deposit Insurance Corp. v. Allen*, 584 F.Supp. 386 (E.D.Tenn.1984), District Judge Milburn listed 11 factors to consider when assessing the domination of a corporation by its shareholders:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and, (11) the failure to main-

---

are injured by application of state law to this case.

**24.** Whether a corporation has been so dominated as to be without "separate mind, will or existence" is a question of fact:

> The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court. Moreover, a determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury.

*Electric Power Board*, 691 S.W.2d at 526. That a corporation is closely held and the stockholders are also officers, directors and sales persons, is

generally insufficient to disregard the corporate entity, *see Kopper Glo Fuel, Inc. v. Island Lake Coal Co.*, 436 F.Supp. 91, 99 (E.D.Tenn.1977), but such facts can be evidence of the exercise of dominion and control. *Nashville Ry.*, 60 S.W.2d at 427. *See also* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, §§ 41.30, 41.35 and 43.20 (rev.perm.ed.1983).

**25.** Fletcher states the instrumentality rule in much the same terms as the Tennessee Supreme Court. 1 Fletcher, *supra* n. 24, at § 43.10. Fletcher suggests that "instrumentality" is not the best term to use in relation to piercing the corporate veil. Observing that all corporations are to some extent instrumentalities, he suggests the use of "alter ego" to describe this theory. *Id.*

tain arms length relationships among related entities.

*Id.* at 397, (citing, *inter alia, Neese,* 386 S.W.2d at 918; *Oak Ridge Auto Repair Service v. City Finance Co.,* 57 Tenn.App. 707, 425 S.W.2d 620 (Tenn.Ct.App.) *cert. denied,* (Tenn. Aug. 7, 1967)). Other factors include the nonpayment of dividends, and:

> the treatment by an individual of corporate assets as his own; ... the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identity of equitable ownership in the two entities; ... the absence of corporate assets; the use of a corporation as a mere shell, instrumentality or a conduit for a single venture or the business of an individual or another corporation; the concealment or misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; ... the use of the corporate entity to procure labor, services, or merchandise for another person or entity; ....

1 Fletcher, *supra* n. 24, § 41.30 at 27–28 (Cum.Supp.1985).

■ All of these factors need not be present to justify disregard of the corporate boundaries; however, it is necessary that substantial equities favor the agressor party. Many of the listed factors are present here. To respect the artifical boundaries of B & L would countenance a fraud on all who dealt with and were harmed by these defendants.

*Failure to collect paid in capital.* B & L commenced operations without collecting paid in capital. B & L never had a net capitalization of $1,000 in violation of its charter and Tennessee corporation law. The "adjusting entry" by Lansford retroactive to April 30, 1979 was an afterthought or a subterfuge insufficient to give B & L the required *net* capital.

*The corporation was grossly undercapitalized.* Van Sant's testimony, the records of B & L and the admissions of B & L's accountant, Lansford, establish that B & L was grossly undercapitalized. B & L never had the necessary capital to commence operations, to purchase equipment or raw materials, to pay salaries, or to conduct its business. Van Sant and Lansford concurred that the corporation had access to capital only when considered with the shareholders and the two related partnerships.

*The issuance of stock certificates.* Olson and Fisher received their certificates prior to payment in violation of TENN. CODE ANN. § 48–1–505(b) and (f) (Michie 1984). The certificate issued to Ledford was in part in exchange for future services in violation of TENN.CODE ANN. § 48–1–505(b) and (f) (Michie 1984).

*Ownership of stock.* The stock of B & L was closely held by three individuals. These same individuals owned and controlled the related partnerships. One shareholder was a named defendant in the state court trade secrets litigation.

*Use of the same business location.* B & L, THP, OFIP and Pioneer all maintained the same address. OFIP and Pioneer maintained no offices. Olson's office was at the B & L plant. The addresses on all bank accounts were the same.

*Use of employees, attorneys and accountants.* B & L, the two partnerships, Olson, Fisher and Ledford used the same attorney, William Conner, and the same C.P.A., Lansford, for all matters relating to the smoke enterprise.[26] B & L and the two partnerships had the same employees.

*Failure to observe corporate formalities.* Repeated disregard for applicable corporate law is evidence that shareholders treated a company as merely an extension of themselves. There are almost endless examples of disregard for the formalities of B & L's corporate existence by Ledford, Olson and Fisher: The failure to obtain

---

**26.** Fisher and CTL may have occasionally consulted a different accountant for other business transactions unrelated to the smoke operation.

$1,000, the minimum capital stated in B & L's charter, before commencing business. *See* TENN.CODE ANN. §§ 48–1–204(2) and 48–1–815(a)(2)(D) (Michie 1984). The failure to obtain written subscriptions for shares. *See* TENN.CODE ANN. § 48–1–504(a) (Michie 1984). The failure to receive consideration for stock when issued. *See* TENN.CODE ANN. § 48–1–505(f) (Michie 1984). The failure to hold annual shareholders' meetings. *See* TENN.CODE ANN. § 48–1–701(b) (Michie 1984). The failure to maintain accurate minutes of shareholders' and directors' meetings. *See* TENN.CODE ANN. § 48–1–716(a)(2) (Michie 1984). The failure to maintain the minimum number of directors. *See* TENN. CODE ANN. § 48–1–802 (Michie 1984). The improper removal of Ledford as a director. *See* TENN.CODE ANN. § 48–1–807 (Michie 1984). The election of directors for terms other than authorized. *See* TENN.CODE ANN. § 48–1–804 (Michie 1984). The failure to have a president and secretary not the same person. *See* TENN.CODE ANN. § 48–1–811(a) (Michie 1984); *United States v. Daugherty,* 599 F.Supp. 671, 675 n. 3 (E.D.Tenn.1984). The voting of proxies at a directors' meeting. *See* TENN.CODE ANN. § 48–1–808 (Michie 1984). Loans to directors and officers without formal shareholder approval. *See* TENN.CODE ANN. § 48–1–814 (Michie 1984). The sale of assets without formal action by directors and shareholders. *See* TENN.CODE ANN. § 48–1–907(b) and (c) (Michie 1984). The unilateral cancellation of (Ledford's) issued stock. *See Cartwright v. Dickinson,* 88 Tenn. 476, 483, 12 S.W. 1030, 1031 (Tenn.1890). The dissolution of the corporation without compliance with TENN.CODE ANN. §§ 48–1–1002 *et seq.* (Michie 1984).

*The diversion or manipulation of corporate assets to the detriment of creditors.* The assets of B & L were systematically diverted from the corporation to the shareholders and the two partnerships. B & L was intentionally rendered an empty shell. Without documents of title or respect of other formalities, the equipment was diverted to OFIP. The real property was divested from B & L into Olson, Fisher, Ledford or Pioneer. Ultimately, the assets were diverted directly into the hands of Olson and Fisher upon distribution of the proceeds of the sale to Griffith. Without these assets, B & L did not exist—it had no other assets, method of operation or source of income. B & L's capacity to function was through the gratuitous use of property controlled by its shareholders through the two partnerships. The principal aim and effect of this manipulation was to place B & L's assets beyond the reach of its creditors and to avoid execution or other undesirable effects of the trade secrets litigation.

*Use of the corporation as a subterfuge in illegal transactions.* From its inception, B & L was organized to enable Ledford and ultimately Olson and Fisher to usurp Hickory Specialties' trade secrets without the inconvenience of personal liability. With cavalier disregard for the injunctions and other orders of the Tennessee courts, Ledford, Olson and Fisher designed, constructed, operated and marketed the smoke operation from behind the screen of B & L. These three men knew their rights to Hickory Specialties' trade secrets were suspect even before the injunction of July 6, 1979. After the injunction, the illegal intent and activity of Ledford, Olson and Fisher was dramatically manifest. They built a plant in violation of the state court orders. They used equipment and manufacturing processes that were stolen from Hickory Specialties and prohibited to them by the chancery injunction. They marketed and distributed liquid smoke in blatant disregard of the appellate courts of Tennessee. They stripped B & L of all assets in the face of the July, 1979 injunction and before Hickory Specialties could reduce its rights to a money judgment.[27]

---

**27.** This scheme had the actual effect of damaging Hickory Specialties in its attempts to collect against B & L. *See Thoni Trucking Co. v. Foster,* 243 F.2d 570, 571 (6th Cir.1957). Stripping a corporation of assets to deprive a claimant of recovery, by the corporation's majority stock-

The smoke operation could have been abandoned after the chancery injunction and almost before it physically existed. Ledford, Olson and Fisher proceeded in a premeditated fashion apparently gambling on a reversal of the injunction. Their testimony that they did not pay attention to the litigation is not credible. The flurry of activity by these men to strip B & L of assets and to conduct the smoke operation with mirrors from behind partnerships and corporations after the July, 1979 injunction demonstrates their effort to hedge the bet on the litigation. They lost this gamble. The use of corporate form as a shield for stockholders is a salutory characteristic of incorporation; it is not a sword for wrongdoing. *Fidelity Trust*, 22 S.W.2d at 6.

*Failure to maintain arms length relationships among related entities.* Assets were transferred between the defendant entities and stockholders at will. The books and records were never reconciled between the shareholders, partnerships and B & L. Rather, these records were manipulated and "adjusted" to suit the needs and motives of the shareholders. No lease agreements were executed. No amounts were agreed upon as rentals. There was continuous comingling of funds between the various elements of the smoke operation. Inter-entity transfers were not documented, were not accurately characterized and in all respects, Olson and Fisher treated the funds of B & L (and the two partnerships) as their own. B & L, the partnerships, Olson and Fisher never operated at arms length.

B & L was the alter ego or instrumentality of Olson and Fisher. They are personally liable for its debts.

## II.

■ The defendant partnerships, Pioneer and OFIP, are responsible for B & L's debts. There was a complete identity of interests between B & L and the partnerships.[28] Recognizing them as separate entities would consummate a fraud on B & L's creditors. B & L and the partnerships were treated as a single entity by Olson and Fisher. The partnerships had no function outside of the smoke operation. The partnerships claim to have owned all of B & L's assets and all of the capital items necessary to the smoke operation. The formalities for existence of these partnerships were not observed and the relationships between the partnerships, B & L and Olson and Fisher were not documented, were not at arms length and were carried out for the purpose of insulating the individuals and their assets from the trade secrets litigation. These partnerships came into existence and "received" B & L's assets after commencement of the litiga-

---

holder is fraud justifying piercing the corporate veil. *Id.*

**28.** The "identity" or "single entity theory" has been accepted by the Tennessee courts as an alternative justification for piercing the corporate veil. *Neese*, 386 S.W.2d at 921–22; *Continental Bankers*, 578 S.W.2d at 631. *But see* 1 Fletcher, *supra* n. 24, at § 43.10 ("Instrumentality," "Alter Ego" and "Identity" are merely different names for the same test.).

The facts in *Neese* were similar to the instant case. Scott N. Brown controlled 70% of the First Trust Co. stock and 70% of the stock of REMCO. Brown was chairman, president and treasurer of both companies. The two companies had the same directors, elected and appointed officers, and executive committees. "The two companies had the same address and the same phone number; there was overlapping of personnel; office materials and supplies were stored together; hiring for both companies was usually done by the same person;" the employ-

ees of both companies were paid by either company; and "There was some overlapping of creditors...." *Neese*, 386 S.W.2d at 920. "There were numerous financial transactions between the two companies most of which were recorded in an "intercompany note account" which was balanced out once a year and notes payable in the amount of the outstanding balance were executed by the debtor company. "No effort was made to collect these notes." *Id.* "The finances of each were treated as the finances of the other, and funds were transferred between the two companies indiscriminately...." *Id* at 922.

Here, Olson and Fisher owned and controlled B & L, OFIP and Pioneer. These three entities were manipulated by Olson and Fisher in much the same manner as the two corporations in *Neese.* It is appropriate to collapse OFIP, Pioneer and B & L into the single entity in which they functioned.

tion and continued to operate as active repositories and conduits after the state court injunctions. Pioneer and OFIP are properly accountable for the debts incurred by B & L. As general partners of OFIP and Pioneer, Olson and Fisher are jointly and severally liable for any deficiency in the partnerships' assets. TENN.CODE ANN. § 61–1–114 (Michie 1980).

### III.

■ The defendants are liable with B & L as partners or joint venturers in the liquid smoke operation. "A partnership is an association of two (2) or more persons to carry on as coowners a business for profit." TENN. CODE ANN. § 61–1–105(a) (Michie 1980).[29]

> 'A partnership,' says Judge Story, 'is usually defined to be a voluntary contract between two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a communion of the profits thereof between them.' ... There is a partnership wherever there is a community of interest in the profits of the business or transactions by the parties as principals or proprietors.... And the agreement to share the profits prima facie implies an agreement to share the losses ... It is unnecessary to the creation of a partnership that the business relation entered into, which constitutes it, be called by that name.

*Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 435, 232 S.W. 961, 969–70 (Tenn. 1921) (citations omitted).

A corporation may be a partner under Tennessee partnership law. TENN. CODE ANN. § 61–1–101(5) (Michie 1980); *Memphis Natural Gas Co. v. Pope*, 178 Tenn. 580, 586, 161 S.W.2d 211, 213 (Tenn.1941) *aff'd sub nom., Memphis Natural Gas Co. v. Beeler*, 315 U.S. 649, 62 S.Ct. 857, 86 L.Ed. 1090 (1942). One partnership may be a partner in another. TENN. CODE ANN. § 61–1–101(5) (Michie 1980). Where intent to form a partnership is manifest, all subterfuges, "resorted to for the purpose of escaping partnership liability, will be disregarded." *Wyatt v. Brown*, 39 Tenn.App. 28, 34, 281 S.W.2d 64, 67 (Tenn.Ct.App.) *cert. denied*, (Tenn. June 10, 1955); *see Memphis Natural Gas*, 178 Tenn. at 580, 161 S.W.2d at 211.

There is ample evidence of intent by Olson, Fisher, OFIP, Pioneer and B & L to manufacture liquid smoke for a profit. Olson and Fisher provided funds, OFIP provided funds and equipment, Pioneer provided the manufacturing facility and B & L performed the manufacturing. Olson and Fisher funded the smoke operation with the express intention of recovering their investments "from the profits of the business." The defendants advanced money to B & L without promissory notes and without repayment terms. The absence of a definite obligation to repay these loans indicates that they were partners of B & L and not creditors. *Jahn v. Lamb*, 36 Bankr. 184, 188–89 (Bankr.E.D.Tenn.1983). The equipment and realty were ostensibly provided by OFIP and Pioneer, but no real rental obligation was established. B & L indiscriminately paid obligations of the defendants and the defendants paid obligations of B & L. The proceeds of the Griffith sale and the gain from that sale were distributed among the defendants. Like the defendants in *Garner*,[30] and *Memphis Natu-*

---

**29.** *Compare*, 48A C.J.S. *Joint Ventures* § 2 at 391–92 (A joint venture is "an association of persons to carry out a single business enterprise for profit.") *cited with approval in Garner v. Maxwell*, 50 Tenn.App. 157, 360 S.W.2d 64, 68 (1961) *cert. denied*, (Tenn. Sept. 7, 1962). A joint enterprise or joint venture, is generally regarded as being distinct from a partnership only in that it is a more temporary arrangement. *See Id.* at 68. *Pritchett*, 232 S.W. at 970.

Joint ventures are governed by the same rules as partnerships. *Pritchett*, 232 S.W. at 970.

**30.** *Garner* involved a trucking operation in which one defendant owned the tractor, one owned the trailer, one was the driver and the fourth was the designated shipper. The parties agreed to share the profits of the enterprise. The court found that the defendants were engaged in a joint enterprise and were liable as partners. *Garner*, 360 S.W.2d at 68.

ral Gas,[31] B & L was "a studied effort" to conceal a pooling of interests including a corporation, two partnerships and three individuals. These arrangements were a subterfuge to avoid liability for the partnership business—manufacturing liquid smoke in violation of the rights of Hickory Specialties and the orders of the Tennessee courts. B & L, Olson, Fisher, OFIP and Pioneer were partners in the liquid smoke operation and each is liable for its debts. TENN. CODE ANN. § 61–1–114 (Michie 1980).

## IV.

The distribution among the defendants of the proceeds from the sale to Griffith was an illegal dividend. Under Tennessee law, dividends may only be paid from the unreserved and unrestricted earned surplus of a corporation or out of its net earnings for an appropriate period. TENN. CODE ANN. § 48–1–511(a)(1) (Michie 1984). A dividend may not be paid when a corporation is insolvent or would be rendered insolvent. TENN. CODE ANN. § 48–1–511(a) (Michie 1984). *See also* TENN. CODE ANN. § 48–1–512(a)(1) (Michie Supp. 1985) (distributions from capital surplus). B & L was never "solvent" nor did it ever have earned surplus or net earnings. A shareholder who receives a dividend or distribution in violation of §§ 48–1–511 or 48–1–512 is liable to the corporation for the amount received. TENN. CODE ANN. § 48–1–720 (Michie 1984). A director who votes for or concurs in such a payment is also liable. TENN.CODE ANN. § 48–1–815(a)(2)(A) (Michie 1984).

Olson and Fisher do not deny receiving most of the Griffith proceeds but defend receipt of this money as repayment of their "loans" to B & L. This argument fails because the "loans" and nonexistent "leases" of land and equipment by Olson and

Fisher are properly reclassified as capital contributions to B & L.

Transactions between a corporation and its majority shareholders may be subject to reclassification as contributions to equity where a corporation has been substantially undercapitalized. *Intertherm, Inc. v. Olympic Homes Systems, Inc.*, 569 S.W.2d 467, 473 (Tenn.Ct.App.) *cert. denied*, (Tenn. June 26, 1978) *and see*, 1 F.H. O'Neal, *Close Corporations*, § 2.10 (1971 CALLAGHAN). A variety of tests have developed to determine when corporate "debt" should be considered a capital contribution. *See Intertherm*, 569 S.W.2d at 473.

[T]here appears to be a judicial tendency toward the conclusion that bonds and other evidence of indebtedness are not bona fide "if issued to the corporation's shareholders in exchange for assets required to get the business underway" and the conclusion that a shareholder cannot be an authentic creditor of the corporation unless he is the psychological equivalent of an independent lender and equally willing to enforce obligations rigidly against the corporation.

. . . .

Another test that has been suggested is whether an outside lender would have made a loan to the corporation; under this test, if an outside lender would not have made the loan, the advance made by the shareholder is to be treated as equity, not debt. The courts have also said that an advance to the corporation will be considered a capital investment and not a loan if the advance is "at the risk of the business" or if the effect of the loan was the same as though the lender had purchased stock. At other times the courts have focused on the inadequacy of capitalization and have indicated that so-called loans will be treated as stock if

---

**31.** In *Memphis Natural Gas* two corporations were bound by a requirements contract, one to sell, the other to purchase and distribute natural gas in Memphis. The contract elaborately adjusted the price of gas in a manner described by the court as "a studied effort to cover up a pooling of interests with the varnish of a sale."

*Memphis Natural Gas*, 161 S.W.2d 213. The two corporations were held to be a partnership because they "[acted] in concert and each was a party to and interested by contract in the operations, profits and/or losses of the other and . . . the whole business is so intertwined as to make their business joint." *Id.* at 216.

only a nominal amount has been invested in stock.

O'Neal, *supra,* § 2.10 at 64–65. Other criteria include: the absence of an unconditional right to demand payment evidenced by a formal, written instrument, maturity date and provision for interest; the absence of security; and, the absence of a provision for repayment other than profits. *See Fischer v. United States,* 441 F.Supp. 32 (E.D.Pa.1977) *aff'd,* 582 F.2d 1274 (3d Cir.1978). A debt to equity ratio greater than 4:1 is sometimes cited as evidence that the corporation was "financed" by the creation of debt. *See Intertherm,* 569 S.W.2d at 473; O'Neal, *supra,* § 2.10 at 64.

■ Application of any of the accepted tests leads to the conclusion that B & L's "debt" to its shareholders is properly identified as capital and the payment from the Griffith proceeds was an illegal dividend. The defendants' "loans" and "leases" were the operating capital of B & L. Formalities were not observed and appropriate debt instruments were not executed for most of the alleged loans. The corporation was grossly undercapitalized. The debt to equity ratio was effectively infinite. Repayment was expected only if the corporation generated earnings—the loans and leases were "at the risk of the business" and should be treated as equity.

■ The "leases" from OFIP and Pioneer to B & L were capital contributions to the same extent as the "loans" from Olson and Fisher. A "lease" may be considered a contribution to capital like a loan of funds where no payments or demand for payments are made or expected except as the "lessee" generates earnings. *In re Labelle, Industries,* 44 B.R. 760, 763 (Bankr.D.R.I.1984). Nor does it matter that OFIP and Pioneer were not shareholders of B & L. As indicated above, OFIP and Pioneer were instrumentalities of Olson and Fisher. A nonshareholder may be held to have made a capital contribution where the corporation is grossly undercapitalized and there is an incentuous relationship between the corporation and the nonshareholder. *Foresun, Inc. v. Commissioner,* 348 F.2d 1006 (6th Cir.1965).

### V.

■ Olson and Fisher are liable for breach of their fiduciary duties as officers, directors and shareholders of B & L. It is well settled in Tennessee that officers, directors and majority shareholders are fiduciaries to their corporations. *See Hayes v. Schweikart's Upholstering Co.,* 55 Tenn. App. 442, 462, 402 S.W.2d 472, 482 (Tenn. Ct.App.1965) *cert. denied,* (Tenn. Apr. 18, 1966) (directors and officers); *Central Bus Lines, Inc. v. Hamilton National Bank,* 34 Tenn.App. 480, 484, 239 S.W.2d 583, 585 (Tenn.Ct.App.) *cert. denied,* (Tenn. Mar. 3, 1951) (officers); *Gillespie v. Branham,* 47 Tenn.App. 234, 337 S.W.2d 689 (Tenn.Ct. App.) *cert. denied,* (Tenn. Dec. 12, 1959) (officer and majority shareholder); *Johns v. Caldwell,* 601 S.W.2d 37, 41 (Tenn.Ct. App.) *cert. denied,* (Tenn. June 23, 1980) (majority shareholder); *and see* TENN. CODE ANN. § 48–1–813 (Michie 1984) ("Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."). This fiduciary duty has been forcefully stated by the Tennessee courts as one of utmost good faith [32] and undivided loyalty.[33] It has been held that a director or officer is essentially a trustee of the corporation. *Hayes,* 402 S.W.2d at 482. Corporate directors, officers and shareholders may lawfully enter into business agreements with their corporations; however, these transactions invite close scrutiny "and must be characterized by the utmost good faith." [34] The burden of proving good

32. *Central Bus,* 239 S.W.2d at 585.

33. *Gillespie,* 337 S.W.2d at 691.

34. *Intertherm,* 569 S.W.2d at 471 (*quoting Fidelity Bankers Trust Co. v. Chapman Drug Co.,* 51 Tenn.App. 246, 255, 366 S.W.2d 528, 532 (1962)). The Tennessee courts have struck down a sale of corporate assets to the principal shareholders, *Gillespie,* 337 S.W.2d at 689, and a sale and leaseback of corporate property, *Central Bus,*

faith lies on the director, officer or majority shareholder. *Id.* at 471–72.

Olson and Fisher failed completely to demonstrate good faith in their dealings with B & L. To the contrary, the evidence affirmatively shows that they plundered the assets of B & L, they caused B & L to engage in an extended campaign of illegal activities, and they caused B & L to assume liability which it had no ability to meet. Olson and Fisher hold the funds from the sale of the smoke operation assets in a constructive trust for the benefit of B & L and its creditors. *Central Bus,* 239 S.W.2d at 585; *Johns,* 601 S.W.2d at 42.

## VI.

The defendants have filed claims against B & L which are properly subordinated to the claims of all other creditors.[35] The principle of equitable subordination of claims is well established, is expressly authorized by the Code, and is obviously applicable in this case. *See* 11 U.S.C. § 510(c) (1982 ed.); H. REP. NO. 595, 95th Cong., 1st Sess. 359 (1977) *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5963, 6315; *and see Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.),* 712 F.2d 206 (5th Cir.1983).

A claim will be equitably subordinated if the claimant has engaged in inequitable conduct which has conferred on it unfair advantage. *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 56 B.R. 339, 400, 13

BANKR.CT.DEC. (CRR) 1172, 1210 (Bankr.D.Minn.1985).[36] The defendants used B & L to defraud Hickory Specialties. Their actions left B & L with no assets and liabilities in excess of $2,000,000. They appropriated B & L's assets and realized upon the Griffith sale. The defendants are not entitled to share in the assets of B & L's bankruptcy estate until all other creditors have been paid in full.

An appropriate order will be entered.

---

239 S.W.2d at 583. Officers have been held liable for actions taken in conflict with the best interests of the corporation, such as conspiring to open a competing business and steal corporate employees and customers. *Hayes,* 402 S.W.2d at 472.

**35.** The defendants may also have claims against B & L as a result of this opinion. Notwithstanding the legality or allowance of those claims, which I do not decide at this time, they are to be subordinated for the reasons set forth in this part VI.

**36.** A third requirement, often stated by the courts, is that subordination should not be con-

trary to the purposes of bankruptcy law. *Bellanca,* 56 Bankr. at 400, 13 BANKR.CT.DEC. at 1210. This requirement is an admonition that the bankruptcy distribution scheme should not be interrupted where the results merely appear unfair. If the claimant has acted in good faith and has not engaged in any improper conduct, subordination would be improper. *See* A. DeNatale and P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus. Law. 417, 427–28 (Feb.1985). The defendants plainly fail to meet this requirement.